# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**MOONLIGHT BASIN RANCH LP**,

        Debtor.

Case No. **09-62327-11**

---

**LEHMAN COMMERCIAL PAPER INC.** And **LEHMAN BROTHERS HOLDINGS INC.**,

        Plaintiffs.

-vs-

**MOONLIGHT BASIN RANCH, LP, a/k/a MOONLIGHT BASIN RANCH, L.P., a/k/a MOONLIGHT BASIN RANCH COMPANY, a/k/a MOONLIGHT BASIN RANCH, LTD.**, **MOONLIGHT LODGE, LLC**, **MOONLIGHT SPA, LLC**, **MOONLIGHT GOLF LLC**, **MOONLIGHT BASIN, LLC**, **MOONLIGHT BASIN MEZZ LLC**, **MOONLIGHT BASIN HOLDINGS LLC**, **MOONLIGHT BASIN RANCH, INC.**, **TREELINE SPRINGS, L.L.C.**, **MOUNTAIN TOP CONSTRUCTION COMPANY, L.L.C.**, **LONE MOUNTAIN FOOD & BEVERAGE, LLC**, **LEE POOLE**, **SIX SHOOTER, L.L.C.**, **JVLP, L.C.C.**, **TIM WILLIAM ANDERSON**, **AARDVARK, L.L.C.**, and **FRONTIER STONE, L.L.C.**,

        Defendants.

Adv No. **10-00009**

1

# MEMORANDUM of DECISION

At Butte in said District this 25th day of June, 2010.

Plaintiffs' Motion for Summary Judgment on the Releases filed February 22, 2010, at docket entry no. 16, is pending in this Adversary Proceeding.  Plaintiffs' Motion is accompanied by a Memorandum in support thereof and, in accordance with Mont. LBR 7056-1, Plaintiffs filed a separate Statement of Undisputed Facts at docket entry no. 17.  Plaintiffs also filed two Affidavits of Thomas Buffa and an Affidavit of Wayne S. Cook, Jr.  In response thereto, the various Moonlight Debtor/Defendants,[1] together with Moonlight Basin Ranch, Inc.[2] filed Opposition to the Plaintiffs' Motion on March 26, 2010, along with a separate Statement of Genuine Issues which is found at docket entry no. 40.  The Moonlight Debtors and Moonlight Basin Ranch, Inc.'s Statement of Genuine Issues was accompanied by Affidavits of Russ McElyea (Chief Operating Officer for Moonlight) and Gerrit Cormany (Chief Financial Officer for Moonlight) along with various materials prepared by Lehman Brothers.  The remaining defendants consisting of Lee Poole, Six Shooter, LLC, JVLP, LLC, Tim William Anderson, Aardvark, LLC, Frontier Stone, LLC and Moonlight Basin Holdings, LLC, filed a Brief in Opposition to Motion for Summary Judgment on March 26, 2010, and also filed a separate

---

[1]  The Moonlight Debtors consist of Moonlight Basin Ranch, LP, Moonlight Basin, LLC (Case No. 09-62332); Lone Mountain Food & Beverage, LLC (Case No. 09-62328); Moonlight Lodge, LLC (Case No. 09-62329); Moonlight Golf, LLC (Case No. 09-62330); Moonlight Spa, LLC (Case No.09-62331); Mountain Top Construction, LLC (Case No. 09-62370); Treeline Springs, LLC (Case No. 09-62368); and Moonlight Basin Mezz, LLC (Case No. 09-62334).

[2]  Moonlight Basin Ranch, Inc. is not a debtor before this Court, but it appears that it has the same counsel as the Moonlight Debtors.

2

Statement of Genuine Issues which is found at docket entry no. 42.

The various parties in this Adversary Proceeding are identified by the Court as follows:

The Moonlight Debtors:

Moonlight Basin Ranch, LP, an Ohio limited partnership ("MBRanch");

Moonlight Basin Mezz, LLC, a Delaware limited liability company ("Mezz") which holds 99% of the partnership interests in MBRanch and 100% of the issued and outstanding shares of stock in Moonlight Basin Ranch, Inc.;

Moonlight Basin, LLC ("Basin") ;

Lone Mountain Food & Beverage, LLC ("Lone Mountain");

Moonlight Lodge, LLC ("Lodge");

Moonlight Golf, LLC ("Golf");

Moonlight Spa, LLC ("Spa");

Mountain Top Construction Company, LLC ("Mountain Top"); and

Treeline Springs, LLC ("Treeline").

The Lehman Brothers parties:

Lehman Commercial Paper, Inc.  ("LCPI");

Lehman Brothers Holdings, Inc. ("LBHI");

Lehman Brothers Commercial Bank ("LBCB");

Lehman Brothers, Inc. ("LBI");

The non-Debtor Defendants:

Moonlight Basin Ranch, Inc., an Ohio corporation and owner of 1% general partnership interest in MBRanch;

Moonlight Basin Holdings, LLC, a Delaware limited liability company, which is a member of, and holds 100% of the membership interests in Mezz;

3

Lee Poole ("Poole");

Tim William Anderson ("Anderson");

Six Shooter, LLC ("Six Shooter");

Aardvark, LLC ("Aardvark"); and

Frontier Stone, LLC ("Frontier").

The following is a chronological summary of the events in this case:

| DATE | AGREEMENT | DESCRIPTION |
|---|---|---|
| March 2007 | | Negotiations of loan terms begin. |
| | | |
| July 19, 2007 | Advisory Agreement Exhibit Z to Plaintiffs' Complaint | LBI and MBRanch agree that LBI has the exclusive right to provide financial advisory services in connection with an attempted sale of Moonlight Basin Ranch. LBI's fee is $75,000/month plus an advisory fee if Moonlight is sold. The Advisory Agreement is signed by LBI and Poole on behalf of MBRanch. |
| | | |
| September 7, 2007 | Senior Loan Exhibit A to the Plaintiffs' Complaint | Pursuant to a Credit Agreement dated September 7, 2007, LBCB, as administrative agent and LBI as sole bookrunner and sole arranger, agreed to loan $100 million to MBRanch to satisfy existing debt, fund development, overhead and operating costs, fund an interest reserve account, fund a development account and pay transaction costs. Maturity Date was March 7, 2008, unless extended pursuant to § 2.12. Poole is identified as a Sponsor with a Sponsor Carve Out Guaranty. Release provision at § 2.11. MBRanch had to meet certain Development Milestones, § 5.23 and Schedule 5.23. Events of Default are found at § 7. Signed by Poole on behalf of MBRanch; by the Credit Officer and Chief Credit Officer of LBCB; and by an authorized signatory of LBI.<br><br>LBCB, LCPI and MBRanch executed Agent Resignation and Appointment Agreement. Exhibit F to Plaintiffs' Complaint |

| | | |
|---|---|---|
| | | MBRanch claims it relied on Lehman's promise to sell the resort and if the resort did not sell, Lehman promised to provide long-term financing.  Debtors refer to this as a short-term bridge loan.<br><br>Pledge Agreement, Exhibit O to Plaintiffs' Complaint.  Subsidiary Guaranty, Exhibit S to Plaintiffs' Complaint.  Sponsor Carve Out Guaranty, Exhibit T to Plaintiffs' Complaint.  Environmental Indemnity Agreement, Exhibit W to Plaintiffs' Complaint. |
| | | |
| September 7, 2007 | Mezz Loan Exhibit B to the Plaintiffs' Complaint | Pursuant to a Credit Agreement dated September 7, 2007, LBHI agreed to loan $70 million to Mezz.  Use of the loan proceeds was to redeem certain partnership interests in MBRanch; for distribution to Member to payoff promissory note from Poole in favor of the DAB Trust, for a loan to Poole from Mezz, and reduction of the principal amount of Loan.  Development Milestones identified in Schedule 5.21.  Section 7 identifies Events of Default.  Signed by Poole as President of Mezz, and an authorized signatory of LBHI, by Poole as Guarantor/Indemnitor/Pledgor,  by Poole as President of Pledgor Mezz, and by Poole as President of Moonlight Basin Holdings, LLC.<br><br>Mezz claims it relied on Lehman's promise to sell the resort and if the resort did not sell, Lehman promised to provide long-term financing.  Debtors refer to this as a short-term bridge loan.<br><br>Pledge and Security Agreement, Exhibit Q to Plaintiffs' Complaint.  Sponsor Carve Out Guaranty, Exhibit V to Plaintiffs' Complaint.  Environmental Indemnity Agreement, Exhibit U to Plaintiffs'  Complaint. |
| | | |
| March 2008 | | Senior Loan matured and between  3/6/08 and 6/5/08, Debtors claim Lehman was shopping the sale of the debt when it should have been shopping the sale of Moonlight Basin Resort under the Advisory Agreement. |
| | | |
| April 15, | Pre-Negotiation | Exhibit EE to Plaintiffs' Complaint. |

| 2008 | Agreement to the Senior Loan | |
| April 15, 2008 | Pre-Negotiation Agreement to Mezz Loan | Exhibit FF to Plaintiffs' Complaint |
| May 13, 2008 | Reservation of Rights Letter | LCPI advanced $1.4 million pursuant to a reservation of rights letter. MBRanch and Mezz requested that LCPI remove release language and LCPI did so. |
| June 5, 2008 | Senior Extension Agreement Exhibit BB to Plaintiffs' Complaint Release 1 | LCPI, MBRanch, Spa, Golf, Basin, Lodge, Treeline, Mountain Top and Lone Mountain F&B extend maturity date of Senior Loan by 6 months to 9/7/08. Signed by LCPI, Poole on behalf of Moonlight Basin Ranch as general partner of MBRanch, and Lee Poole, Spa, Golf, Basin, Lodge, Treeline, Mountain Top and Lone Mountain as guarantors. Contains a General Release; Covenant Not to Sue. |
| June 5, 2008 | Mezz Ratification & Amendment Exhibit CC to Plaintiffs' Complaint Release 2 | LBHI, Mezz, Poole, Anderson, Moonlight Holdings, LLC, Moonlight, Inc., Six Shooter, JVLP & Aardvark agree to increase commitment to $78 mil and shortened maturity to 9/7/08. Signed by Mezz, Poole as Sponsor, Moonlight Basin Holdings, LLC, Moonlight Basin Ranch, MBRanch, Six Shooter, JVLP, Aardvark, Anderson, and LBHI. Contains a release of claims provision. |
| June 5, 2008 | Advisory Amendment Exhibit AA to Plaintiffs' Complaint Release 3 | LBI and MBRanch amend Advisory Agreement to extinguish LBI's exclusive rights to provide financial advisory services, along with other amendments. |
| Sept. 7, 2008 | | Debtors fail to repay the loans constituting an automatic default under § 7 of the Credit Agreement and Mezz Agreement. |

| | | |
|---|---|---|
| Nov.4 , 2008 | | Lehman allegedly tells Debtors that the loans, or the rights to the loans, were sold to Bankhaus, A.G.  Thus, Lehman tells Debtors that the decision to use sales proceeds for operating capital & decision to sell debt to 3rd party rests with Bankhaus. |
| Nov. 17, 2008 | | Lehman, not Bankhaus, requests that Poole grant deeds in lieu of foreclosure and that Poole enter into a management agreement with Lehman.  Lehman then informs Moonlight that Lehman, not Bankhaus, has authority to make all decisions regarding the loans, the sale of Moonlight debt, and any foreclosure actions. |
| December 2008 | | Parties negotiate for an advance of funds without release of all claims.  Debtors "not willing to sign waivers or releases as a condition to receipt of funding which helps Lehman as much as us." |
| Dec. 18 & 19, 2008 | | Poole, on behalf of MBRanch and Mezz signs two term sheets for forbearance agreements.  Terms sheets contain a waiver and release of claims and defenses. |
| June 19, 2009 | Senior Forbearance Agreement Exhibit GG to Plaintiffs' Complaint Release 4 | LCPI, MBRanch, Mezz, Poole, Anderson, Mountain Top enter into forbearance agreement (LCPI agreed to forbear from exercising certain rights and remedies for a period of time).  Incorporates integration clause. § 8, Release and covenant not to sue.  Signed by MBRanch, LCPI, and Poole, Anderson, and Mountain Top as Pledgors.  Reservation language in Poole's favor.  Contains a Release and Covenant Not to Sue. |
| June 19, 2009 | Mezz Forbearance Agreement Exhibit HH to Plaintiffs' Complaint Release 5 | LBHI, Mezz, Poole, Anderson & Moonlight Holdings enter into forbearance agreement (LBHI agreed to forbear from exercising certain rights and remedies for a period of time).  Incorporates integration clause. § 8, Release and covenant not to sue.  No signatures.  Reservation language in Poole's favor.  Contains a Release and Covenant Not to Sue. |

7

| July 22, 2009 | First Amendment to Promissory Note Exhibit G to Plaintiffs' Complaint | Dealing with a Promissory Note, dated as of September 14, 2007, made by Lee Poole in favor of Mess in the original principal amount of $4.5 million. |
|---|---|---|

## STATEMENT of UNCONTROVERTED FACTS

The Plaintiffs assert the following facts in support of their Motion for Summary Judgment:

### The Loans

1. In the early spring of 2007, Moonlight Basin Ranch, L.P. ("Borrower") and its principal indirect owner, Lee Poole, considered their options concerning existing debt, including refinancing, seeking new sources of operating capital, or selling Moonlight Basin Resort to a qualified third party purchaser.[3]

2. On September 7, 2007, Borrower entered into a $100,000,000 Credit Agreement (the "Credit Agreement") with Lehman Brothers Commercial Paper Inc.' s ("LCPI") predecessor in interest, Lehman Brothers Commercial Bank ("LBCB"), as lender (the "Senior Loan"). *See* Compl. Ex. A. (Credit Agreement).[4]

3. All of LBCB's interests relating to the Credit Agreement and the Loan Documents

---

[3]  *See* Affidavit of Thomas Buffa in Support of Motion for Summary Judgment ("Buffa Summ. J. Aff."), Ex. A, at Ex I (Defendant Moonlight Basin's Supplemental Brief Opposing Receiver ("Foreclosure Opposition Brief"), Montana 5th Judicial Cir., Madison County, Case No. DV 29-2009-83) at 21; *see also* Buffa Summ. J. Aff., Ex J (Affidavit of Russ McElyea ("McElyea Aff.") ¶ 7.

[4]  All references to "Compl. Ex." refer to the exhibits filed with Lenders' Complaint for Declaratory Relief filed with this Court on February 2, 2010.

were assigned to LCPI pursuant to the Agent Resignation and Appointment Agreement, dated as of September 7, 2007, by and between LBCB and LCPI. This included LBCB's rights as Administrative Agent under the Credit Agreement.  *See* Compl. Ex. F (Agent Resignation and Appointment Agreement).

4.  The $100 million principal amount of the Senior Loan was to be used to pay off existing debt of the Borrower, to fund development and operating expenses of Moonlight Basin Resort, and for costs associated with obtaining and closing the loan.  *See* Compl. Ex. A (Credit Agreement) at 2.7.

5.  As collateral security for payment of the Senior Loan, Borrower and certain of its affiliates, its subsidiaries, and its principal and indirect owner, Lee Poole, together with Tim Anderson, delivered certain mortgages, pledges, and guaranties in various property (the "Senior Loan Collateral") to LCPI.  *See* Compl. Ex. H (Borrower Mortgage), J (Lodge Mortgage), M (Security Agreement), O (Senior Pledge Agreements), S (Senior Subsidiary Guaranty), and T (Senior Sponsor Carve Out Guaranty).

6.  During the term of the Senior Loan, the monies lent to Borrower by LCPI were used for the continuous operations of Moonlight Basin Resort; improvements to Moonlight Basin Resort; and expenses related to the parties' mutual goal of selling the Moonlight Basin Resort to provide Defendants with funds to pay off the Senior Loan and Mezz Loan (and generate a profit for Defendants and their principal, Lee Poole).  *See* Affidavit of Thomas Buffa dated November 17, 2009 ("Buffa Foreclosure Aff."), Ex. B, ¶ 10.

7.  On September 7, 2007, Moonlight Basin Mezz LLC, as borrower, entered into a $70,000,000 Mezzanine Loan Agreement (the "Mezz Agreement"), with LBHI as lender (the

9

"Mezz Loan," together with the Senior Loan, the "Loans").  *See* Compl. Ex. B (Mezz Agreement).

8.  The $70 million principal amount of the Mezz Loan was to be used to repurchase the equity interest relating to Moonlight Basin Resort held by Poole's partners, thereby increasing Poole's ownership percentage with respect to Moonlight Basin Resort, and to make a $4.5 million personal loan to Poole.  *See* Compl. Ex. B (Mezz Agreement) at 2.4.

9.  As collateral security for payment of the Mezz Loan, Mezz Borrower and its principal and indirect owner, Lee Poole, together with Tim Anderson and Moonlight Holdings, delivered certain pledges and guaranties in various property (the "Mezz Collateral," together with the Senior Loan Collateral, the "Collateral") to LBHI.  *See* Compl. Ex. Q (Mezz Pledge Agreements); V (Mezz Sponsor Carve Out Guaranty).

10.  Each of the Senior Credit Agreement and Mezz Agreement contained an integration clause, indicating that the agreement "and any separate letter agreements . . . constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof." *See* Compl. Ex. A (Credit Agreement) at 9.21(A); Ex. B (Mezz Agreement) at 9.21(A).

11.  The Loans were the product of six months of negotiations between the parties.  *See* Buffa Summ. J. Aff. ¶ 4.

12.  Defendants are experienced commercial entities and business persons who have spent years building and operating the complex businesses and properties that make up the Resort.  *See* Buffa Summ. J. Aff., Ex J (McElyea Aff.) ¶¶ 5, 6.

13.  Defendants were represented by sophisticated counsel throughout the negotiations

involving the Loan Documents, including Montana attorney Russ McElyea, the Ohio law firm Brouse McDowell, and two international law firms – Greenberg Traurig, LLP and Holland & Hart LLP.  Greenburg Traurig, for one, is a highly respected international law firm consisting of more than 1700 attorneys.  Joseph F. Kishel, Esq. served as one of Borrowers' counsel from Greenburg Traurig.  According to his firm's website, Mr. Kishel is a 1985 Columbia Law School graduate who, in addition to his 29 years of experience in construction lending and secured lending, was named a Super Lawyer by Super Lawyer Magazine for the years 2008 and 2009.  Mr. Kishel is based out of New York, New York and has broad experience in virtually all aspects of sophisticated commercial real estate transactions, including representation of lenders, borrowers, owners, developers, and tenants.  In connection with the Loans, Defendants incurred significant attorneys' fees.  *See* Buffa Summ. J. Aff. ¶ 5; Compl. Ex. D (Loan Closing Statement).

14.  The law firms representing Defendants supplied legal opinions that the Loans were enforceable.  *See* Compl. Ex. E (Legal Opinions).

15.  As of November 18, 2009 (the "Petition Date"), the date the Debtors commenced their Chapter 11 cases, the outstanding balance on the Senior Loan was $95,271,019.73.  *See* Buffa Summ. J. Aff. ¶ 8.

16.  As of the Petition Date, the outstanding balance on the Mezz Loan was $103,836,253.81.  *See id.*

17.  The Loan Documents, including the Advisory Amendment, Extension Agreement, Mezz Amendment, and the Forbearance Agreements, all contain a choice-of-law provision specifying that New York law applies.  *See*, ex., Compl. Ex A (Credit Agreement) at Sec. 9.17; Ex. AA (Advisory Amendment) at Sec. 10; Ex. BB (Senior Extension Agreement) at 5; Ex. CC

11

(Mezz Amendment) at Sec. 12; Ex. DD (Forbearance Agreement) at Sec. 17; Ex. HH (Mezz

Forbearance Agreement) at Sec. 16.

### The Real Property

18.  The real property that is the subject of this action is located in Madison County,

Montana.  The Moonlight Basin Resort is a complex property consisting of approximately 7,800

acres improved with ski facilities, residential units, a spa, a golf course, a lodge, and related

amenities, along with unimproved lots.  The property comprises Parcels I through XXI (the

"Mortgaged Property").  *See* Compl. Ex. H (Borrower Mortgage) at Ex. A; Compl. Ex. J (Lodge

Mortgage) at Ex. A.

19.  Borrower is the owner of Fee Parcels I - VI, VIII - XIX and Easement Parcels XX

and XXI of the Mortgaged Property, including all appurtenances (collectively, the "Borrower

Parcels").  *See id.*

20.  Lodge is the owner of Parcel VII of the Mortgaged Property (the "Lodge Parcel"),

including all appurtenances.  The Borrower Parcels and the Lodge Parcel together comprise the

Mortgaged Property.  *See id.*

### The Mortgages

21.  The Mortgaged Property was provided as collateral pursuant to two mortgage

security instruments.  *See* Compl. Ex. H, J.

22.  For the purpose of securing payment of the indebtedness and performance of all

obligations under the Credit Agreement, Borrower, as mortgagor, executed and delivered a

"Montana Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing,"

dated September 7, 2007, in the amount of $100,000,000, given by Borrower to LBCB, which

was duly recorded September 7, 2007, as Document No. 121938, records of Madison County, Montana, encumbering the Borrower Parcels (as amended, the "Borrower Mortgage"). *See* Compl. Ex. H.

23. LBCB amended and assigned the Borrower Mortgage to LCPI by the "First Modification of Montana Mortgage Assignment of Leases and Rents Security Agreement and Fixture Filing" (the "Borrower Mortgage Modification"), dated as of September 7, 2007, and recorded as Document No. 121939 in the records of Madison County. *See* Compl. Ex. I.

24. In Article I of the Borrower Mortgage, Borrower pledged to LCPI all right, title, and interest in and to the Borrower Parcels, and the buildings and improvements made thereto, together with, *inter alia*, all water rights, mineral rights, and water stock relating to the Borrower Parcels, the Water Rights Purchase Agreement, easements, rights of way, covenants, and appurtenances, as more fully set forth and defined in the Borrower Mortgage. *See* Compl. Ex. H.

25. In Article III of the Borrower Mortgage, Borrower irrevocably assigned to LCPI all right, title, and interest in, to, and under all leases to the subject property, and all rents, revenue, income, issues, deposits, letters of credit, and profits of the subject property. *Id.*

26. In Article IV of the Borrower Mortgage, Borrower granted to LCPI a first and prior security interest on all personal property used in connection with the Borrower Parcels, including but not limited to fixtures, chattel, accounts, inventory, cash receipts, and letters of credit. The provisions of this Article include an express statement that, with respect to any personal property that constitutes a fixture under the laws of the State of Montana, the Borrower Mortgage constitutes a fixture filing under the laws of the State of Montana. *Id.*

27. For the purpose of securing payment of the indebtedness and performance under the

Credit Agreement, Lodge, as mortgagor, executed and delivered a "Montana Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing," given by Lodge to LBCB, dated September 7, 2007, in the amount of $100,000,000.00, which was recorded September 7, 2007, as Document No. 121935, in the records of Madison County, Montana, and encumbers the Lodge Parcel (as amended, the "Lodge Mortgage"). *See* Compl. Ex. J.

28. LBCB amended and assigned the Lodge Mortgage to LCPI by the "First Modification of Montana Mortgage, Assignment of Leases and Rents Security Agreement and Fixture Filing" (the "Lodge Mortgage Modification"), dated as of September 7, 2007, and recorded as Document No. 121935 in the records of Madison County. *See* Compl. Ex. K.

29. In Article I of the Lodge Mortgage, Lodge pledged to LCPI all of its right, title, and interest in and to the Lodge Parcel, and the buildings and improvements made thereto, together with, *inter alia*, all water rights, mineral rights, and water stock relating to the Lodge Parcel, the Water Rights Purchase Agreement, easements, rights of way, covenants, and appurtenances as more fully set forth and defined in the Lodge Mortgage. *See* Compl. Ex. J.

30. In Article III of the Lodge Mortgage, Lodge irrevocably assigned to LCPI all right, title, and interest in, to, and under all leases to the subject property, and all rents, revenue, income, issues, deposits, letters of credit, and profits of the subject property. *Id.*

31. In Article IV of the Lodge Mortgage, Borrower also granted to LCPI a first and prior security interest in all personal property used in connection with the Lodge Parcels, including, but not limited to, fixtures, chattel, accounts, inventory, cash receipts, and letters of credit. The provisions of this Article include an express statement that with respect to any personal property that constitutes a fixture under the laws of the State of Montana, the Lodge Mortgage constitutes

14

a fixture filing under the laws of the State of Montana. *Id.*

### The Security Agreement

32.  For the purpose of further securing payment of the indebtedness and performance under the Credit Agreement, Borrower also executed and delivered a Security Agreement (as amended, the "Security Agreement"), dated as of September 7, 2007, by and among (i) LCPI, (ii) Debtors Borrower, Lodge, Moonlight Spa, Moonlight Golf, Moonlight Basin, Treeline, Mountain Top, and Lone Mountain, and (iii) three non-debtor entities, Aardvark, Six Shooter, and JVLP (all such debtor and non-debtor entities collectively, "Grantor"). *See* Compl. Ex. M.

33.  Pursuant to the Security Agreement, Grantor granted LCPI a security interest in and to all of Grantor's "right, title and interest in and to all of the personal property of Grantor, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired, wherever the same may be located and whether or not subject to the Uniform Commercial Code. . . ." *Id.* at Sec. 1.

34.  The collateral pledged under the Security Agreement, which includes but is not limited to all money, deposits, security accounts, commodity accounts, various contracts for construction and design, equipment leases, letters of credit, food and beverage licenses, records, chattel paper, trademarks, trade names and other intellectual property, and commercial tort claims, is listed and/or referenced in Schedules 6, 7, 8, and 9 attached to the Security Agreement. *Id.*

35. LCPI perfected its security interest with respect to the Security Agreement by filing Uniform Commercial Code Financing Statements with the Montana Secretary of State and with the Ohio Secretary of State with respect to Borrower and each of the other parties constituting the

15

Grantor under the Security Agreement.  A UCC Lien search conducted by the Montana Secretary of State's office shows that LCPI holds a first position perfected security interest covering "all assets" of the parties constituting the Grantor thereunder, including, but not limited to Borrower, subject only to possible purchase money security interests in individual items of personal property.  *See* Compl. Ex. N.

**The Pledge Agreements**

36.  For the purpose of further securing payment of the indebtedness and performance under the Credit Agreement, several pledge agreements, each dated September 7, 2007, were duly executed and delivered to LCPI as follows: (i) Borrower of its interest in each of the Subsidiaries; (ii) Mountain Top of its ownership interest in Frontier; (iii) Poole of his ownership interests in Six Shooter and JVLP; and (iv) Anderson of his ownership interests in Aardvark (collectively, the "Senior Pledge Agreements")*. See* Compl. Ex. O.  The ownership interests pledged pursuant to the Pledge Agreements are referred to collectively as the "Senior Pledged Interests."

37. LCPI perfected its security interest with respect to the Senior Pledge Agreements by filing Uniform Commercial Code Financing Statements with the Montana Secretary of State against Poole's and Anderson's rights to the Credit Agreement Pledged Interests.  A UCC lien search conducted by the Montana Secretary of State's office shows that LCPI holds a first position perfected security interest in the rights of (i) Borrower, with respect to its interests in the Subsidiaries; (ii) Mountain Top, with respect to its interest in Frontier; (iii) Poole, with respect to his ownership interests in JVLP and Six Shooter; and (iv) Anderson, with respect to his ownership interests in Aardvark.  *See* Compl. Ex. P.

38.  For the purpose of further securing payment of the indebtedness and performance under the Mezz Agreement, several pledge agreements, each dated September 7, 2007, were duly executed and delivered to LBHI as follows: (i) Mezz Borrower of its interests in Borrower and Moonlight Inc; (ii) Moonlight Holdings of its interests in Mezz Borrower; (iii) Poole of his interests in JVLP and Six Shooter; and (iv) Anderson of his interests in Aardvark (collectively, the "Mezz Pledge Agreements").  *See* Compl. Ex. Q.  The ownership interests pledged pursuant to the Mezz Pledge Agreements are referred to collectively as the "Mezz Pledged Interests."

39.  LBHI perfected its security interest with respect to the Mezz Pledge Agreements by filing Uniform Commercial Code Financing Statements with the Montana Secretary of State against Poole's and Anderson's rights to the Mezz Pledged Interests.  *See* Compl. Ex. R.

## The Guaranties

40.  For the purpose of further securing payment of the indebtedness and performance under the Credit Agreement, several guaranties were duly executed and delivered to LCPI as follows:

(a)  A guaranty of all obligations under the Senior Loan pursuant to a subsidiary guaranty, dated September 7, 2007, provided by the Subsidiaries to LCPI (the "Subsidiary Guaranty").  *See* Compl. Ex. S.

(b)  A guaranty of specified losses in connection with the Senior Loan and the entire Senior Loan itself upon certain contingencies, specifically including, but not limited to, a bankruptcy filing by the Borrower, pursuant to the Sponsor Carve Out Guaranty provided by Poole to LCPI, dated September 7, 2007 (the "Senior Sponsor Carve Out Guaranty").  *See* Compl. Ex. T.

17

(c)  The Environmental Indemnity Agreement, dated September 7, 2007, and provided by Borrower and Poole to LCPI (the "Senior Environmental Indemnity"), which, by its terms, survives repayment of the Senior Loan, or the exercise by LCPI of its remedies with respect thereto.  *See* Compl. Ex. U.  The Subsidiary Guaranty, the Senior Sponsor Carve Out Guaranty, and the Senior Environmental Indemnity are referred to collectively herein as the "Senior Guaranties").

41.  For the purpose of further securing payment of the indebtedness and performance under the Mezz Agreement, several guaranties were duly executed and delivered to LBHI as follows:

(a)  A guaranty of specified losses in connection with the Mezz Loan and the entire Mezz Loan itself upon certain contingencies, specifically including, but not limited to, a bankruptcy filing by the Mezz Borrower, pursuant to the Sponsor Carve Out Guaranty provided by Poole to LBHI, dated September 7, 2007 (the "Mezz Sponsor Carve Out Guaranty").  *See* Compl. Ex. V.

(b)  The Environmental Indemnity Agreement, dated September 7, 2007, and provided by Mezz Borrower and Poole to LBHI (the "Mezz Environmental Indemnity"), which, by its terms, survives repayment of the Loan, or the exercise by LBHI of its remedies with respect thereto. *See* Compl. Ex. W.

### The Collateral Assignment of Rights

42.  For the purpose of further securing payment of the indebtedness and performance under the Credit Agreement, Borrower and Lodge executed and delivered to LCPI a "Collateral Assignment of Declarant's Rights," whereby Borrower and Lodge granted to LCPI a first lien on and security interest in, and assigned, transferred, and set over all of their right, title, and interest

to certain Declarations of Unit Ownership (defined therein) to LCPI.  *See* Compl. Ex. X.

### The Water Rights

43.  The Mortgages and the Security Agreement granted LCPI a security interest in, *inter alia*, all water, water rights, and water stock related to the Mortgaged Property, and the Security Agreement granted LCPI a security interest in certain water rights and certain sewer rights (collectively, the "Water Rights").  Pursuant thereto, LCPI was granted a security interest in all Water Rights arising out of and/or in connection with the Mortgaged Property.  *See* Compl. Ex. H, J, M.

### The Allonge

44.  As additional collateral for the Senior Loan, LCPI was given an Allonge to a certain Amended and Restated Purchase Money Promissory Note executed by Frontier in favor of Mountain Top, in the original principal amount of $147,800, whereby payment under the Note was authorized to be made to LCPI in its capacity as administrative agent under the Credit Agreement (the "Allonge").  *See* Compl. Ex. Y.

### The Drink and Beverage Licenses

45.  Both the Security Agreement and the Pledge Agreements provide LCPI with, *inter alia*, a security interest in certain Beverage Licenses ("Licenses") and a pledge of the ownership interests of the entities that hold such Licenses.  *See* Compl. Ex. M, O, Q.

### The Advisory Agreement

46.  On July 19, 2007, prior to the date of the Loans, Borrower entered into a letter agreement with Lehman Brothers Inc. ("LBI") that gave LBI the exclusive right to provide financial advisory services in connection with a sale of the Mortgaged Property (the "Advisory

Agreement").  *See* Compl. Ex. Z.

47.  LBI is a separate legal entity from Lenders.  *See* Buffa Summ. J. Aff. ¶ 13.

48.  LBI is the subject of a liquidation proceeding pursuant to the Securities Investor Protection Act of 1970 (the "SIPA Liquidation") and James W. Giddens has been appointed the Trustee for the liquidation.  The SIPA Liquidation is pending before the United States Bankruptcy Court for the Southern District of New York.  *Id.*

49.  Of all of the Loan Documents, only the Advisory Agreement and the amendment thereto (discussed below) concern the sale of the Resort.  *See* Compl. Ex. A, B, H, J, L, M, O, Q, S, T, U, W.

50.  The Advisory Agreement did not include a promise to sell the Resort.  *See* Compl. Ex. Z.

51.  The Advisory Agreement did not include any reference to the Resort being sold within 10 – 12 weeks.  *See id.*

52.  The Advisory Agreement references that LBI will "develop, update and review with [Moonlight Basin Ranch, L.P.] on an ongoing basis the parties which might be interested in acquiring [Moonlight Basin Ranch, L.P.].  *See* Compl. Ex. Z at Sec. 2(c).

53.  Under the Advisory Agreement, Borrower agreed to pay LBI "a retainer fee of $75,000 per month in advance for the duration of [LBI's] engagement . . ."  *See* Compl. Ex. Z at Sec. 4(a).

54.  The Advisory Agreement also provides LBI with a success fee "if" the sale of the Resort comes to fruition:

If, during the term of [LBI's] engagement hereunder or at any time during a period

of 12 months following the effective date of termination of [LBI's] engagement hereunder, an agreement to effect a Sale is entered into or a Sale is consummated, [Moonlight Basin Ranch, L.P.] shall pay [LBI] an advisory fee equal to 1.0% of the Consideration involved in such Sale.

*See* Compl. Ex. Z at Sec. 4(b).

55.   Under the Advisory Agreement, "either party may terminate [LBI's] engagement hereunder at any time by giving the other party at least 10 days' prior written notice." *See* Compl. Ex. Z at Sec. 13.

56.   Pursuant to the terms of the Advisory Agreement, the Advisory Agreement "may not be amended or modified except in writing signed by each of the parties…" *See* Compl. Ex. Z at Sec. 15.

### The Protective Advances

57.   After the initial maturity date and before Borrower repaid the Senior Loan or the parties extended the terms of the Senior Loan, LCPI made multiple protective advances to Borrower. *See* Buffa Summ. J. Aff. ¶ 9.

58.   Pursuant to the terms of the Senior Loan as a condition precedent to a disbursement of funds "[n]o Default or Event of Default shall have occurred and be continuing on the Requested Withdrawal Date." *See* Compl. Ex. A (Credit Agreement) at Sec. 3.2(ii).

59.   Lenders approved these disbursements at Borrower's request. *See* Buffa Summ. J. Aff. ¶ 9.

60.   LCPI made these advances pursuant to a series of reservation of rights letters. *See id.*

61.   For example, on May 13, 2008, LCPI advanced Borrower more than $1.4 million pursuant to a reservation of rights letter (the "Reservation of Rights Letter"). *See* Buffa Summ. J.

21

Aff. ¶ 10, Ex. B.

62.  During the negotiations, Borrower requested that LCPI remove language from the Reservation of Rights Letter that would have released Borrower's and Poole's claims against LCPI.  LCPI agreed and removed the release language from the Reservation of Rights Letter.  *See* Buffa Summ. J. Aff. ¶¶ 10, 11.

### The Advisory Amendment and the Release

63.  The Advisory Agreement was amended on June 5, 2008 (the "Advisory Amendment"), one result of such amendment was that LBI no longer had the exclusive right to provide advisory services in connection with the sale of the Mortgaged Property.  *See* Compl. Ex. AA.

64.  By the time the Advisory Amendment was executed, Defendants were aware that the Resort had not been sold in the 325 days after the signing of the Advisory Agreement.  *See* Buffa Summ. J. Aff. ¶ 16.

65.  Under the Advisory Amendment, LBI "agrees to waive the payment of the $75,000 monthly fee set forth in" the Advisory Agreement.  *See* Compl. Ex. AA.

66.  Borrower was represented and advised by Montana attorney Russ McElyea, Borrower's in-house counsel as well as experienced and sophisticated outside counsel, Greenberg Traurig, LLP, in connection with the negotiations relating to the Advisory Amendment.  *See* Buffa Summ. J. Aff. ¶¶ 6, 12.

67. As part of the Advisory Amendment, Borrower agreed to a Release of Claims, which provided that Borrower:

(i) . . . acknowledges that it has no claims or defenses against [LBI] in any

capacity and its respective members, partners, affiliates, subsidiaries, shareholders and 'controlling persons' (within the meaning of the federal security laws), and its respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing that relate to, arise out of or otherwise are in connection with the Advisory Agreement, any transactions contemplated thereby or any actions or omissions in connection therewith, or any aspect of the dealings or relationships between [Borrower] and [LBI], and (ii) [Borrower] releases [LBI] from any such claims, whether or not now known, existing or arising out of circumstances that have occurred on or prior to the Amendment Date.

(the "Advisory Agreement Release"). *See* Compl. Ex. AA at Sec. 7.

68. As part of the Advisory Amendment, Borrower expressly agreed that "all of the rights, obligations and duties of [LBI] and [Borrower] are expressly set forth in writing in the Advisory Agreement." *See* Compl. Ex. AA. at Sec. 6.a.

69. Borrower also expressly agreed that but for the Advisory Amendment, "there have been no other amendments, orally or in writing, to the Advisory Agreement." *See* Compl. Ex. AA. at Sec. 9.

70. As part of the Advisory Amendment, Borrower expressly agreed that "[LBI] is acting as an independent contractor and not in any other capacity and does not owe [Borrower] any fiduciary duties, whether express or implied." *See* Compl. Ex. AA. at Sec. 6.a.

71. The Advisory Amendment is clear and unambiguous in its terms. *See* Compl. Ex. AA.

72. Despite engaging DTZ to market and sell the Moonlight Basin Resort, from June 5, 2008, until the Petition Date, the nation's economic crisis caused financing options for the sale to become virtually nonexistent, and Debtors were also unable to sell the Moonlight Basin Resort. *See* Buffa Summ. J. Aff. ¶ 14; Buffa Foreclosure Aff. ¶ 21.

23

**The Loan Amendments and Releases**

73.  Lenders also agreed to amend the Loans.  For the Senior Loan, LCPI and Borrower, Poole, Moonlight Spa, Moonlight Golf, Moonlight Basin, Lodge, Treeline, Mountain Top, and Lone Mountain (collectively, the "Extension Borrower Parties") executed a loan amendment on June 5, 2008 (the "Senior Extension Agreement") wherein they extended the maturity date six months, to September 7, 2008 (the "Senior Maturity Date").  *See* Compl. Ex. BB (Senior Extension Agreement).

74.  Prior to executing the final documents, the parties circulated multiple drafts of proposed amendments to the Advisory Agreement, the Credit Agreement, and the Mezz Agreement.  *See* Buffa Summ. J. Aff. ¶¶ 12, 15.  For example, on May 29, 2008, Defendants' attorneys from Greenberg Traurig sent LCPI their notes to the proposed amendments to the Advisory Agreement, the Credit Agreement, and the Mezz Agreement.  *See id.*   Although the comments to all three agreements were extensive, attorneys for Defendants had no comments with respect to the Releases.  *See* Buffa Summ. J. Aff. Ex. D.

75.  Under section (xv) of the Senior Extension Agreement, each Guarantor "hereby ratifies, reaffirms, confirms and acknowledges all of its representations, covenants, agreements, obligations and liabilities under, and the terms and conditions of, the Cost Overrun Guaranty, the Sponsor Carve Out Guaranty, the Subsidiary Guaranty and the Environmental Indemnity, to which each is a party as amended hereby, and agrees to continue to be bound thereby and perform thereunder."  *See* Compl. Ex. BB.

76.  Under the Senior Extension Agreement, the parties agreed that all of "the Loan Documents are in full force and effect in accordance with their written terms, and have not been

amended or waived, orally or in writing, in whole or in part." *See id.* at Sec. (xiii).

77.  For the Mezz Agreement, LBHI and Mezz Borrower, Poole, Anderson, Moonlight Holdings, Moonlight Inc., Borrower, Six Shooter, JVLP, and Aardvark (collectively the "Mezz Amendment Borrower Parties") executed a loan amendment (the "Mezz Amendment," together with the Senior Extension Agreement, the "Loan Amendments") wherein they revised the maturity date to September 7, 2008 (the "Mezz Maturity Date," together with Senior Maturity Date, the "Maturity Dates") and increased the commitment to Mezz Borrower to $78,000,000. *See* Compl. Ex. CC (Mezz Amendment).

78.  Under sections 6 and 7 of the Mezz Amendment, each Mezz Guarantor "hereby ratifies, reaffirms, confirms and acknowledges all of its representations, covenants, agreements, obligations and liabilities under, and the terms and conditions of" the Mezz Sponsor Carve Out Guaranty and the Mezz Environmental Indemnity.  *See* Compl. Ex. CC.

79.  Under the Mezz Amendment, the parties agreed to reaffirm "all terms and covenants made in the Loan Documents…" *See* Compl. Ex. CC at Sec. 5.1.

80.  The parties also agreed that each of them "ratifies, reaffirms, confirms and acknowledges all of its representations, covenants, agreements, obligations and liabilities under, and the terms and conditions of, all of the other Loan Documents to which it is a party as amended hereby, and agrees to continue to be bound thereby and perform thereunder.*"* *See* Compl. Ex. CC (Mezz Amendment) at Sec. 8.

81.  The Loan Amendments are clear and unambiguous in their terms.  *See* Compl. Ex. BB, CC.

82.  In exchange for Lenders' agreement to amend the Loans, the Extension Borrower

Parties and Mezz Amendment Borrower Parties (and, *inter alia*, their members, subsidiaries, and affiliates) expressly agreed to release all claims relating to, *inter alia*¸ the Loans, including but not limited to claims for fraud.  Specifically, the Senior Extension Agreement and Mezz Amendment both include unambiguous releases stating that Extension Borrower Parties and Mezz Amendment Borrower Parties release LCPI and LBHI as follows:

> . . . from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever . . . whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, against [LCPI/LBHI] in any capacity (whether as administrative agent, lender or otherwise) . . . based in whole or in part on facts, whether or not now known, existing on or before [the date of this agreement], that relate to, arise out of or otherwise are in connection with: (i) the Loan Agreement, any of the other Loan Documents, or transactions contemplated thereby or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between [Extension Borrower Parties/Mezz Amendment Borrower Parties], on the one hand, and [LCPI/LBHI], on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any other Claims whatsoever against any Release.

(the "Loan Amendment Releases").  *See* Compl. Ex. BB (Senior Extension Agreement) at Sec. xvii; Compl. Ex. CC (Mezz Amendment) at Sec. 9.

83.  By the time the Loan Amendments were executed, Defendants were aware that the Resort had not been sold in the 325 days after the signing of the Advisory Agreement.  *See* Buffa Summ. J. Aff. ¶ 16.

### The Defaults

84.  The Maturity Dates came and went and Borrowers failed to and continue to fail to repay the outstanding principal of the Loans and all accrued and outstanding interest thereon.

26

*See* Buffa Summ. J. Aff. ¶ 8.

85.  Borrowers' failure to repay the Loans or before the Maturity Dates constitutes an automatic event of default under Section 7 of the Credit Agreement and Mezz Agreement, respectively.  *See* Compl. Ex. A, B.

86.  Borrowers' event of default required no notice or cure period.  *See id.* at Sec. 7.

87.  On December 17, 2008, Russ McElyea, counsel for Borrowers, advised Lenders as follows:  "We are not willing to sign waivers or releases as a condition to receipt of funding which helps Lehman as much as us."  *See* Buffa Summ. J. Aff. ¶ 11.

88.  Thereafter, Lenders advanced funds without receiving a release of claims from Borrower.  *See id.*

### The Forbearance Agreements and Releases

89.  Following the Senior Maturity Default and Mezz Maturity Default, the parties began extensive negotiations for a forbearance agreement.  *See* Buffa Summ. J. Aff. ¶ 17.

90.  For example, on December 18 and 19, 2008, Poole, on behalf of Borrower, signed two term sheets for a forbearance agreement.  Both term sheets contained a waiver and release of claims against Lenders and their affiliates relating to the Loans.  *See id.*

91.  The negotiations then proceeded, on and off, for over six months.  *See id.*

92.  During this period, the parties exchanged multiple drafts of forbearance agreements.  *See id.*

93.  In their January 5, 2009, mark up of the proposed forbearance agreement that Greenberg Traurig sent to LCPI, attorneys for Defendants, included multiple comments about the release provision.  *See* Affidavit of Wayne Cook ("Cook Aff."), attached as Ex. C, at ¶ 3., Ex. A.

27

94.  Many of these comments were included in the final Forbearance Agreements. Compare Cook Aff., Ex. A., with the Forbearance Releases, defined herein at U/F ¶ 101.

95.  Following these extensive negotiations, LCPI on the one hand and Borrower, Poole, Anderson, and Mountain Top (collectively, the "Senior Forbearance Borrower Parties") on the other hand entered into a Forbearance Agreement, dated June 19, 2009 (the "Senior Forbearance Agreement").  *See* Compl. Ex. GG.

96.  On the same day, LBHI on one hand, and Mezz Borrower, Poole, Anderson, and Moonlight Holdings (the "Mezz Forbearance Borrower Parties") on the other hand entered into a Forbearance Agreement (the "Mezz Forbearance Agreement").  *See* Compl. Ex. HH.  The Senior Forbearance Agreement and the Mezz Forbearance Agreement are referred to collectively herein as the "Forbearance Agreements."

97.  Borrower and Mezz Borrower were represented by in-house counsel, Russ McElyea, and experienced and sophisticated outside counsel, Greenberg Traurig, LLP, in the negotiations for the Forbearance Agreements.  *See* Buffa Summ. J. Aff. ¶¶ 6, 12.

98.  Pursuant to the Forbearance Agreements, LCPI and LBHI agreed to, *inter alia*, forbear from exercising certain rights and/or remedies under, and with respect to, the Senior Loan, the Mezz Loan, and the Loan Documents for a period of time (the "Forbearance Period"), terminate a guaranty related to cost overruns issued by Poole (the "Cost Overrun Guaranty"), and release Poole from any obligations under the Cost Overrun Guaranty.  *See* Compl. Ex. GG, HH.

99.  The Forbearance Agreements provide that the Forbearance Period was to end upon the earlier of: (i) a default under the Forbearance Agreements; (ii) a further default under the Credit Agreement or Mezz Agreement; or (iii) the failure of Borrower or Mezz Borrower to

repay the Loans in full by July 19, 2009.  *See id.*

100.  In the Forbearance Agreements, the Senior Forbearance Borrower Parties and Mezz Forbearance Borrower Parties "hereby acknowledge[] and reaffirm[] [their] obligations, duties, covenants and liabilities to [LCPI and LBHI] under the Loan Documents, including, but not limited to, the obligation to pay to Lender all amounts due under the Loan Agreement and the other Loan Documents . . . [and that] there are no claims, demands, offsets or defenses at law or in equity against Lender[.]"  *See* Compl. Ex. GG at Sec. 1, HH at Sec. 1.

101.  In consideration of LCPI's and LBHI's agreement to the Forbearance Agreements, in Section 8 of those Agreements, the Senior Forbearance Borrower Parties and Mezz Forbearance Borrower Parties, jointly and severally, released and discharged LCPI and LBHI, respectively:

> (a) . . . of and from any and all claims, actions, suits, warranties, promises, agreements covenants, rights, demands, damages, liabilities, omissions, obligations or Obligations, of any kind, against Released Parties [defined as LCPI and LBHI, its predecessors, successors and assigns, and their respective officers, directors, shareholders, partners, agents, employees, servants, related corporations, subsidiaries, affiliates, partnerships, representatives, or other entities related thereto and its attorneys], including, without limiting the generality of the foregoing, any condition, act, omission, event, contract, liability, obligation, claim, cause of action, damage, defense (to the extent permitted by law), circumstance or matter of any kind whatsoever, in each case, which existed, arose or occurred at any time prior to the date of this Agreement [June 19, 2009] in connection with the Loan, or which could arise after said date because of any of the foregoing which existed at said date.

> (b) Borrower[s] and Pledgors shall not directly or indirectly institute, prosecute, or aid or assist in, or cooperate with, the institution or prosecution of any action, suit, hearing or other proceeding or any kind, nature or character, at law or in equity, against [Lenders] in order to collect, enforce, declare, assert establish or otherwise raise any defense, claim, cause of action, liability, or obligation (i) which is within the scope of those released in Paragraph 8a, or (ii) which arises out of any fact, defect, contract, condition, obligation, event, action, omission, circumstance, or other matter of any kind which is the basis for any such defense, claim, cause of action, liability, or obligation released hereunder.  This Agreement shall constitute

a complete defense to any claim, cause of action, liability, or obligation released hereunder.

(the "Forbearance Releases").  *See* Compl. Ex. GG, HH.

102.  The Forbearance Agreements also contain Waivers of Rights whereby the Senior

Forbearance Borrower Parties and Mezz Forbearance Borrower Parties waived any defense,

protection, or right to object to LCPI's or LBHI's commencement of an action on the Senior Loan

or Mezz Loan.  *See* Compl. Ex. GG at Sec. 8(e), HH at Sec. 8(e).

103.  Under Section 3 of the Forbearance Agreements,

[the Guarantors] hereby acknowledge and reaffirm each and all of their respective obligations, duties, covenants and liabilities to [LCPI and LBHI] under the Loan Documents to which they are a party.  Pledgors further acknowledge and agree that there are no claims, demands, offsets or defenses at law or in equity that would defeat or diminish Lender's present and unconditional right, subject to this Agreement, to collect the Obligations and to proceed to enforce the rights and remedies available to [LCPI and LBHI] as provided in the Loan Documents and by law and equity.  Guarantors and Pledgors hereby consent to this Agreement, and Borrower's covenants, representations, undertakings, and waivers, including waivers of defenses, contained herein, and affirm that, except as expressly set forth herein, the obligations under the Loan Documents to which they are a party are in no way released, waived, modified or reduced as a result of this Agreement.

*See* Compl. Ex. GG at Sec. 3, HH at Sec. 3.

104.  The Forbearance Agreements confirm that the Forbearance Releases induced

Lenders to enter the Forbearance Agreements.  Specifically, the Forbearance Releases

constituted a material inducement to Lender to enter into this Agreement, and that Lender would not have done so but for those waivers and releases and Lender's expectation that the same are valid and enforceable in any and all events.

*See* Compl. Ex. GG at Sec. 8(d), HH at Sec. 8(d).

105.  The Forbearance Agreements contained an integration clause, stating

unambiguously that the "Loan Documents, including this Agreement, contain or expressly

incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein, and supersede all prior negotiations."  *See* Compl. Ex. GG at Sec. 15, HH at Sec. 14.

106.  Each of the Forbearance Borrower Parties also expressly acknowledged that it "has sought the advice of, and has been advised by, legal counsel of their choice, in connection with the negotiation of this Agreement, and that each signatory hereto has willingly entered into this Agreement with full understanding of the legal and financial consequences of this Agreement." *See* Compl. Ex. GG at Sec. 11, HH at Sec. 10.

107.  The Forbearance Agreements were clear and unambiguous in their terms.  *See* Compl. Ex. GG, HH.

108.  Borrower did not repay the Senior Loan during the Forbearance Period.  *See* Buffa Summ. J. Aff. ¶ 8.

109.  Mezz Borrower did not repay the Mezz Loan during the Forbearance Period.  *See id.*

### Defendants' Claims

110.  On December 4, 2009, Debtors filed a memorandum in this Court and argued, among other things, that the Loan Documents are not valid, binding, and enforceable, and LCPI and LBHI do not have valid, perfected, and enforceable first-priority mortgage and security interests, as Borrower and Mezz Borrower were "fraudulently induced to execute those documents."  *See* Debtors' Memorandum Establishing Invalidity of Loan Documents and Purported Releases of Debtors' Claims  [Doc No. 92] ("Debtors' Memorandum") at 5, 15, 17, 18.

111.  On September 11, 2009, LCPI filed a state-court foreclosure action against

Defendants, which case was captioned:  *Lehman Commercial Paper Inc. v Moonlight Basin Ranch Limited Partnership, et al.*, Cause No. DV-29-2009-83 before Montana's Fifth Judicial District Court, in and for Madison County, Montana.  Defendants did not attempt to rescind the Releases or otherwise claim they entered into the Releases as a result of duress or unconscionability until November 2, 2009, when certain of the Defendants filed answers in the state-court foreclosure action asserting various affirmative defenses in an attempt to invalidate LCPI's valid, perfected, and enforceable first priority mortgage and security interests.  Defendants answered LCPI's complaint, but did not file any counterclaims or any third party claims.  *See* Buffa Summ. J. Aff. ¶ 21, Ex H.

112.  Defendants did not file or otherwise assert a claim in the Chapter 11 bankruptcy cases of LCPI and LBHI in the United States Bankruptcy Court for the Southern District of New York, and the applicable claims bar date has passed.  *See* Buffa Summ. J. Aff. ¶ 22.

113.  Further, in their answer in the state-court Foreclosure Action, Defendants asserted various affirmative defenses in an attempt to invalidate LCPI's valid, perfected, and enforceable first priority mortgage and security interests.  *See* Buffa Summ. J. Aff. ¶ 21.

114.  Defendants claim that the Court should invalidate Lenders' liens because Lenders purportedly induced Defendants to enter into the Loan Documents by promising to either "sell the Resort within 10 to 12 weeks" of the September 7, 2007, closing date of the Loans or "offer a long-term financing arrangement that would meet" Defendants' needs.  *See* Debtors' Memorandum at 5.

115.  The Loan Documents do not include any promise to sell the Resort.  *See* Compl. Ex. A, B, H, J, L, M, O, Q, S, T, U, W.

116.  The Loan Documents do not include any promise to provide long-term financing. *See id.*

117.  Each of the Releases are clear and unambiguous.  *See* Compl. Ex AA, BB, CC, GG, HH.

The Moonlight Debtors responded to the Plaintiffs' Statement of Undisputed Facts with the following:

## STATEMENT of GENUINE ISSUES

### Location of Negotiations, Receipt of Funds

1.  The state of Montana has significant and substantial contacts with the subject matter of this litigation, including:  most of the Moonlight Debtors are incorporated in Montana; all have their principal place of business in Montana; the Resort is located in Montana, the negotiations by the Moonlight Debtors occurred while they were in Montana; the Moonlight Debtors executed all documents at issue in Montana; the monetary transactions relating to the receipt and payment of loan proceeds all involved Montana financial institutions; all the business operations funded by the loan transactions occurred in Montana; and the real estate sales proceeds used to repay the loans at issue were generated in Montana where the real property is located.  *See* attached Exhibit 1, Affidavit of Russ McElyea, dated March 25, 2010, ¶¶ 5-16.

### Initial Representations by "Lehman Brothers" to Induce Moonlight to Enter into the 2007 Transactions

2.  In or about the late winter and early spring of 2007, Moonlight Basin Resort carried a debt load of less than $50 million and was considering its options with regard to the debt, including refinancing, seeking new sources of operating capital, or selling Moonlight to a

qualified third party purchaser.  *See* attached Exhibit 2, Affidavit of Russ McElyea, dated December 4, 2009, ¶ 7.

3.  When it became known that the Defendants were considering refinancing or possibly selling the Resort, members of Moonlight's management had conversations with Mr. Kurt Kohlmeyer, who owns property at Moonlight and was at that time an executive with Lehman. Exh. 2 ¶ 8.

4.  Mr. Kohlmeyer represented to Moonlight that Lehman had the capacity to address all of Moonlight's potential financial needs, including financing and business advisory services to assist with the sale of Moonlight.  Exh. 2 ¶ 9.

5.  "Lehman Brothers" made presentations to, gave commitments to, and executed various agreements with, the Moonlight Debtors, using various "Lehman" corporations, divisions, and affiliates to achieve their objectives.  Exh. 1 ¶ 17.

6.  As evidenced by the various pitch books and presentations given to the Moonlight Debtors, "Lehman Brothers" made such presentations and commitments without necessarily or always identifying who worked for what corporation or in what capacity. Exh. 1 ¶ 18.

7.  Rather, the presentations and materials all emphasized that "Lehman Brothers" had all the capability to meet the needs of the Moonlight Debtors. Exh. 1 ¶ 19.

8.  Lehman Brothers, and each of their employees, agents, and representatives, at all times represented Lehman Brothers to be sophisticated investment bankers and financiers with expert knowledge in all types of financing transactions and in the sale of luxury four-season resorts similar to Moonlight Basin. Exh. 1 ¶ 20.

9.  As part of the financing transactions, and as material inducement to the Moonlight

34

Debtors to enter into the financing transactions with Lehman Brothers, Lehman Brothers repeatedly and emphatically promised it could and would sell the Resort for between $300 to $400 million dollars within 10 to 12 weeks.  In fact, two of Lehman Brothers' written proposals to the Moonlight Debtors promised such a sale in as few as 6 to 8 weeks. Exh. 1 ¶¶ 21-22.

10.  Lehman Brothers represented it was a "one-stop shop" capable of meeting all of Moonlight's financial needs, was interested in a long-term relationship with Moonlight, and would not make loans which would inevitably result in Moonlight's default and ultimate foreclosure.  Exh. 1 ¶ 23.

11.  As a condition precedent to making loans to the Moonlight Debtors, Lehman Brothers conducted extensive due diligence on the financial condition of the Moonlight Debtors, as well as into their historical and projected operations and future development and business plans.  The Moonlight Debtors created a virtual data room, which contained approximately 1.65 GB of information, organized into 50 separate folders and 485 separate files, and which is estimated to consist of thousands of pages of documents.  Lehman Brothers was given unrestricted access to the virtual data room so it could familiarize itself with the Resort.  Exh. 1 ¶ 24.

12.  Based upon a review of these documents during due diligence, it was clear it would be impossible for the Moonlight Debtors to re-pay the loans being advanced by Lehman Brothers without the sale of the Resort in the time frame and price range promised by Lehman Brothers. Exh. 1 ¶ 25.

13.  Lehman and its Representatives repeatedly represented that it would sell the Moonlight Basin Resort before the maturity date of either of the loans, but in the event a sale had

not been consummated, Lehman Brothers would enter into long-term financing with the Moonlight Debtors.  Lehman Brothers, through Mr. Kohlmeyer and Mr. O'Reilly repeatedly promised they would not leave the Moonlight Debtors "on a bridge to nowhere."  Exh. 1 ¶ 27.

14.  Because Lehman Brothers represented that long-term financing would not be needed because they would close the sale of the Resort before the loans matured, the Senior Loan was structured as a short-term bridge loan with an initial six-month maturity date with the option to extend it for one additional six-month period and the Mezzanine Loan was structured as a short-term bridge loan with a two-year maturity date. Exh. 1 ¶ 28.

15.  The Moonlight Debtors accepted these short, bridge-loan terms in reliance on Lehman Brothers' representations it could produce (a) a quick sale at a purchase price sufficient to timely repay the loans in full, (b) provide a return on equity to its owners, (c) suitable long-term financing would be made available in the unlikely event that the they could not sell the Resort as promised, and (d) that Moonlight would not be left on a bridge to nowhere. Exh. 1 ¶¶ 30-31.

**One Inter-Related Transaction**

16.  The agreements set forth in the Investment Advisory Services Agreement, the Senior Loan, the Mezzanine Loan, and all related ancillary documents were part of one inter-related transaction.  The closing of one agreement would not have occurred without the closing of the other agreements.  Drafts of all transaction documents were typically circulated to and reviewed by the transaction participants in one package.  In fact, simultaneously with the signing of the Investment Advisory Services Agreement on July 20, 2007, the parties also executed the Bridge Loan Engagement Letter, the Bridge Loan Fee Letter, the Bridge Loan Term Sheet, and the Mezz

Loan Term Sheet.  The Senior Loan and the Mezzanine Loan were originally scheduled to close on or about August 9, 2007, just weeks after the execution of the Investment Advisory Services Agreement and the related engagement and fee letters.  However, on August 8, 2007, Lehman Brothers requested a delay in closing.  The transactions ultimately closed on September 7, 2007. Exh. 1 ¶¶ 33-37.

### Lehman Brothers' Initial Failure to Sell the Resort and Assertions of Default by Moonlight

17.  Between September 2007 and March 2008 Lehman Brothers failed to present a qualified buyer for the Resort and by March 2008 when the Senior Loan became due, no qualified buyer had been found by Lehman Brothers and no purchase and sale agreement had been entered into for the Resort.  Exh. 1 ¶¶ 38-43.

18.  The failure of Lehman Brothers to sell the Resort as represented placed the Moonlight Debtors in the untenable position of imminent default on the short-term Senior Loan. Exh. 1 ¶ 44

19.  Because no buyer had been found by late January 2008, Moonlight exercised its option to extend the maturity date of the short-term Senior Loan on January 28.  Exh. 1 ¶ 45.

20.  Lehman Brothers refused to automatically extend the Senior Loan as required by Section 2.12 of that agreement, and instead required extensive renegotiations of the Senior Loan and the Mezzanine Loan.  Exh. 1 ¶¶ 46-48.

### Lehman's Assertion of Economic Coercion and the "Take-It-Or-Leave-It" Release Demands in 2008

21.  Between March 6, the date the Senior Loan matured, and June 5, the date the extension on the Senior Loan and the amendment to the Mezzanine Loan were closed, Lehman

Brothers exerted significant economic pressure on Moonlight by a variety of actions and failures to timely act, which included:

(a)  erroneously asserting that the Senior Loan was in technical default because of Moonlight's failure to meet a development milestone even though the deadline for completing this milestone had not yet arisen and its own employees admitted the issue was non-material and was only being asserted to gain leverage over Moonlight Exh. 1 ¶ 52;

(b)  sending a notice of default that the Senior Loan had matured and was unpaid after telling Moonlight that the Senior Loan extension had not been completed only because Lehman was behind in its paperwork Exh. 1, ¶ 51;

(c)  asserting that Lehman Brothers "was in control and you [Moonlight] will do exactly as we say;" that Lehman Brothers would "dictate" terms of the deal, and that the "gloves would come off" and Lehman Brothers would foreclose on the Loans unless Moonlight agreed to every condition dictated by Lehman Brothers Exh. 1 ¶ 54;

(d)  by ostensibly shopping Moonlight's debt during this same period when Lehman's efforts should have been exclusively devoted to selling the Resort Exh. 1 ¶¶ 56-59;

(e)  threatening to foreclose on the Resort, demanding significantly higher fees be paid, and forcing the re-negotiation of substantive terms of both the Senior Loan and the Mezzanine Loan (which loan was not scheduled to mature for an additional 18 months), all on terms substantially more favorable to Lehman Brothers than under the existing loan agreements Exh. 1, ¶ 62;

(f)  refusing to grant a lien release to complete the sale of Resort property to a third party purchaser unless Moonlight executed a Reservation of Rights letter containing language

38

requiring Moonlight to acknowledge it was in default on the Loans and to waive and release any and all claims it had against Lehman Brothers Exh. 1 ¶¶ 67-77;

(g)  insisting that the Moonlight Debtors execute Lehman Brothers' form Pre-Negotiation Agreements as a condition precedent for negotiating any loan extension and refusing amendments to require the parties to negotiate in good faith and to forbear on all foreclosure activities while the parties were negotiating Exh. 1 ¶¶ 68; 78-82;

(h)  requiring the re-negotiation of and agreement on new and additional development milestones Exh. 1 ¶¶ 69; 83-85;

(i)  requiring Moonlight to perform construction work at the Resort specified by Lehman Brothers, including the completion of the Entryway and the Back 9 of the golf course Exh. 1 ¶ 83;

(j)  requiring Moonlight to increase the borrowings under the Mezzanine Loan Exh. 1 ¶ 88;

(k)  requiring the payment to Lehman Brothers of substantial loan origination fees, administrative fees, and attorneys fees Exh. 1 ¶ 84; [and]

(l)  requiring Moonlight to contract with third party vendors for the construction work demanded by Lehman Brothers.  Exh. 1 ¶ 85.

*See*, generally Exh. 1, ¶¶ 63-96.

22.  These actions were designed to create an economic crisis that would force Moonlight to acquiesce to amendments to the loan agreements, to the increase of borrowings under those loan agreements, and ultimately to execute the purported broad release of claims language required by Lehman Brothers.   Exh. 1, ¶ 70.

23.  By the end of April 2008 the delay in getting the loan extensions completed and the new project spending funded was having serious impacts upon Moonlight's ability to continue operations.  Exh. 1, ¶ 86.

24.  On April 30, 2008, Lehman Brothers presented a term sheet which required the Mezzanine Loan to be increased by $8,300,000; required Moonlight to pay a 1% extension fee; extended the Senior Loan maturity date but shortened the Mezzanine Loan maturity date; purported to modify the development milestones (although the document setting forth the modifications was not attached to the term sheet); allowed the Lender to dictate the sales prices for all real estate at the Resort; required a payment of $35,000,000 on January 1, 2009; increased the minimum exit fee payable by Moonlight to Lehman Brothers to $15,000,000; required Moonlight to execute a "general release of Lender and its affiliates from any liability arising prior to the date of the execution of the restructuring documents;" amended the Investment Advisory Services Agreement; and conditioned closing subject to additional due diligence, underwriting and internal approval processes to be conducted by Lehman Brothers.  Exh. 1, ¶ 88.

25.  On May 13, Moonlight informed Ms. Kagan and Mr. Liang that they had to quickly finish the loan extension process as the delays were having significant adverse affects on Moonlight's business.  Exh. 1, ¶ 90.

26.  On May 16, Mr. Nastasi forwarded a revised term sheet to Moonlight.  The revisions were minor and generally not substantive.  Moonlight was informed these terms were "take it or leave it."  Exh. 1, ¶ 91.

27.  In an email dated May 19, 2008, to Mr. Nastasi, Mr. Gilhool, Mr. Buffa, Mr. O'Reilly, Mr. Broderick and Ms. Kagan, among others, Moonlight once again reiterated that

40

getting the loan extension and financing completed was now "a matter of considerable urgency" and that Moonlight's ability to complete some of the workflow required by the term sheet "is contingent on lining up contractors and ordering materials within the week."  Exh. 1, ¶ 92.

28.  On June 5, three months after the initial maturity date on the Senior Loan and only three months in advance of the new maturity date for the Senior Loan, the loan extension agreements were finally closed.   Exh. 1, ¶ 93.

29.  Moonlight was repeatedly told by Ms. Kagan that the substantive terms of the new milestones, the Pre-Negotiation Agreements, and the Loan Extension Agreements were "take-it or leave-it" agreements; that Moonlight was required to "do it this way or the gloves would come off;" that Lehman Brothers "was in control and you [Moonlight] will do exactly as we say;" and that Lehman Brothers would "dictate" terms of the deal: "what term, what payments, and all substance of the deal."  These comments were reinforced by comments from other Lehman personnel. Exh. 1, ¶ 94.

30.  Moonlight agreed to the new loan terms, to the Reservation of Rights letters, to the Pre-Negotiation Agreements, and to the new development milestones only because of the superior bargaining position of Lehman Brothers, which was the direct result of economic duress caused by Lehman Brothers' failure to (a) sell the Resort within the time promised, (b) provide long term financing as it had promised, and (c) honor the automatic loan extension terms set forth in the original Senior Loan agreement.  Lehman Brothers placed the Moonlight Debtors on a bridge to nowhere and then exploited the situation to extract broad releases and waivers of claims and defenses. Exh. 1, ¶ 5.

31.  In addition to these significant economic concessions Lehman Brothers demanded

releases and waivers of claims and defenses from the Moonlight Debtors of any wrongdoing by Lehman Brothers.  Exh. 1, ¶ 97.

32.  Lehman Brothers specifically informed the Moonlight Debtors that the release language was non-negotiable and that they would have to take-it or leave-it.  Lehman Brothers also informed Moonlight that if they did not accept the release language and the other terms of the deal, Lehman Brothers would initiate foreclosure actions to take the Resort.  Exh. 1, ¶ 98.

33.  Facing the Hobson's choice of executing a document containing broad and over-reaching releases or the initiation of foreclosure proceedings and the prospect that other Moonlight stakeholders such as employees, property owners, guests, and vendors would be immediately and adversely impacted by foreclosure proceedings, the Moonlight Debtors were forced to agree to these terms in both of the loan amendments.   Exh. 1, ¶ 99.

34.  During this same time period when Moonlight was confronted with the prospects of the impending default and foreclosure proceedings if it did not agree to amend the loan documents on terms extremely favorable to Lehman, Mr. O'Reilly admitted that Lehman Brothers was unable to meets its obligations as the exclusive sales agent for the Resort. Therefore, Moonlight was forced, at the same time it agreed to the loan extension terms and conditions, to amend the Investment Advisory Services Agreement.  The Amendment to the Investment Advisory Services Agreement contained the same required releases and waivers of claims and defenses language.  Exh. 1, ¶¶ 100-105.

### Lehman's Continuing Action to Create Economic Duress

35.  In the summer of 2008, after Moonlight signed the Extension Agreements, Moonlight learned that Lehman Brothers had continued to shop the Moonlight debt to the same market that

Moonlight was trying to sell equity in the Resort.  Because potential purchasers can purchase debt cheaper than they can purchase equity, Lehman Brothers' actions made a sale of the Resort's equity virtually impossible, and severely undermined Moonlight's ability to attract a buyer for the Resort.  Lehman Brothers took these actions at the very same time Mr. O'Reilly, was supposed to be actively engaged in trying to sell the Resort on Moonlight's behalf.  Exh. 1, ¶ 106.

36.  On August 1, 2008, Moonlight sent a letter to Mr. Gilhool, Mr. O'Reilly and Mr. Buffa informing Lehman Brothers that its activity in the market was undermining Moonlight's ability to sell the Resort and depressing the value of the company.  Moonlight asserted that "The message we are hearing is that Lehman is anxious to clean up its balance sheet and is willing to throw me and my company under the bus to achieve its balance sheet goals.  Those actions contradict the promises you made to protect my interests, and create a serious conflict between your role as advisor to my company and your role as lender."  Moonlight demanded that Lehman Brothers stop shopping the Moonlight paper and depressing the value of the Resort, and to allow Moonlight the room needed to sell the company for its fair value.  Exh. 1, ¶ 107.

37.  On August 11, Mr. Gilhool and Mr. Nash responded in part that "Lehman has the right to sell Moonlight debt and that the loan documents are in full force and effect in accordance with their written terms."  Exh. 1, ¶ 108.

38.  The message from Lehman Brothers was clear:  they would do what they pleased despite any fiduciary duties it owed to Moonlight to sell the Resort as originally promised when they induced Moonlight to enter into the loan transactions.  Exh. 1, ¶ 109.

39.  In early September 2008, shortly before the Senior Loan matured, Moonlight's management attended a meeting at Lehman Brothers' corporate offices in New York City.  Mr.

Gilhool and Mr. O'Reilly, who had personally made the representations upon which Moonlight relied to enter into the Senior Loan and the Mezzanine Loan, were in attendance.  Exh. 1 ¶ 110.

40.  At that meeting, Mr. Gilhool announced it was Lehman Brothers' intention to "take" ownership of the Resort.  Lehman and its Representatives would foreclose on the loans and pay Mr. Poole only "a sliver" of a management fee to operate the Resort.  Mr. Gilhool also stated it was vitally important for the protection of the Resort that the public not be aware of any foreclosure action and that the transition be managed with the current management team so that the public would have confidence in the continued operation of the Resort.  Mr. Gilhool then promised to pay all outstanding draw requests to insure vendors and contractors that Moonlight hired to perform the capital improvements required by Lehman as part of the loan Extension Agreements were made whole during Lehman's proposed "seamless transition" of ownership and management.  Exh. 1, ¶ 111.

41.  By September 7, 2008, when the Senior Loan matured, neither Mr. O'Reilly nor Lehman Brothers had found a buyer for the Resort or any portion of the Resort as they promised they would do more than a year earlier.   Exh. 1, ¶ 112.

42.  By September 7, 2008, when the Senior Loan matured, Lehman Brothers had not provided any long-term financing terms to Moonlight, and had placed it on the "bridge to nowhere" exactly where they promised they would not leave Moonlight more than a year earlier. Exh. 1, ¶ 113.

### Lehman's Bankruptcy, the Issue of Who Owns the Debt, and Lehman's Economic Oppression Intensifies

43.  On September 15, 2008, approximately one week after New York meeting, multiple

Lehman Brothers companies, including LCPI, LBHI and Lehman Brothers Inc., but excluding Lehman Brothers Commercial Bank, declared bankruptcy.  Exh. 1, ¶ 114.

44.  In September of 2008, after the various Lehman Brothers entities declared bankruptcy, Lehman Brothers refused to make advances to operate the Resort and refused to grant mortgage releases for real property sales at the Resort, which sales would have provided needed working capital.  Moonlight repeatedly informed Mr. Gilhool, Mr. Buffa, and others of the potential dire consequences of a failure to fund Resort operations.  Exh. 1, ¶¶ 115; 128.

45.  During the Fall of 2008 Lehman Brothers' own actions and omissions cast considerable doubt on whether LCPI owns any portion of the debt at issue here or whether the loan had been sold to a German financial institution called Bankhaus A.G., which itself had gone into bankruptcy.  This question of ownership has never been resolved or documented by Lehman Brothers.  Exh. 1, ¶¶ 117-126.

46.  On November 17, Mr. Buffa informed Moonlight that Lehman Brothers would not fund any more dollars for Moonlight operations unless "they own the project."  Mr. Buffa suggested that Lee Poole execute a deed in lieu of foreclosure and enter into a management agreement with them to operate the project.  Mr. Poole rejected Mr. Buffa's offer.  Exh. 1, ¶ 141.

47.  On December 17, Moonlight emailed Mr. Buffa and told him that, as a condition to obtaining much needed advances of operating capital for the Resort: "We [Moonlight] are willing to sign letters similar to the PNA's [Pre-Negotiation Agreements] which preserve the status quo. We are not willing to sign waivers or releases as a condition to receipt of funding which helps Lehman at least as much as us."  Exh. 1, ¶ 152.

48.  Mr. Buffa responded: "In order for us to continue funding you need to execute the

letter." Exh. 1, ¶ 153.

49.   On December 18, Lehman proposed that, in exchange for Moonlight's execution of the protective advance letter and a non-binding term sheet on the work out proposal which would contain waivers of claims, they would agree to forebear on any foreclosure action until April 1, fund operations based on an agreed to budget, and negotiate in good faith with Moonlight or Preservation Capital for the sale of the Moonlight debt.   Exh. 1, ¶ 154.

50.   Moonlight was told that if it wanted Lehman Brothers to negotiate instead of foreclosing, Moonlight was obligated to execute these documents with the purported release language intact.   Exh. 1, ¶ 155.

51.   Because Moonlight had previously been told the release and waiver of claims provisions were non-negotiable, Moonlight again understood Lehman Brothers would not entertain the elimination or amendment of these terms from the forbearance agreement draft. Exh. 1, ¶ 157.

52.   Moonlight attempted to further negotiate the forbearance term sheet.  Ultimately, Lehman Brothers required their draft term sheet be executed as it had been presented with the waiver language in place.  Exh. 1, ¶ 158.

53.   Facing the prospect of foreclosure by Lehman Brothers on the one hand, and shutting down the Resort on the other hand, Moonlight had no option but to execute the term sheet with the purported release and waiver language in the hopes that Lehman Brothers would negotiate in good faith on the sale of Moonlight's debt.  Exh. 1, ¶ 159.

54.   On December 24, Mr. Nastasi forwarded a draft forbearance agreement to Moonlight. This document was not immediately negotiated or signed by either of the parties. Exh. 1, ¶ 160.

55.   During the period beginning with Lehman's bankruptcy up until the time Moonlight was forced to sign the Forbearance Agreements in June 2009, Lehman continued to exert severe economic pressure on the Resort by:

(a)  making sporadic and intermittent loan advances on an episodic basis rather than on a predictable schedule;

(b)  refusing to authorize loan advances in the full amount Moonlight requested; but instead ignoring some requests altogether, partially funding other requests picking and choosing which Moonlight vendors received payments.  When funds were authorized in any amount, it was often only after passage of considerable time.

(c)  repeatedly declining throughout the Fall of 2008, to pay accounts payable which resulted in Moonlight  laying off 75% of its work force and halting all construction projects at a time when Moonlight should have been preparing for the 2008-2009 ski season and completing construction projects before winter – which generated rampant rumors about a possible bankruptcy filing by Moonlight in 2008, and substantially damaged Moonlight's ability to sell ski passes, attract guests, and sell Resort real estate for the 2008-2009 season.

(d)  Refused to timely respond to requests for loan advances, refused to fund operations and maintenance obligations of the Resort, selectively paid some vendors but not others, refused to fund continued to golf course development, and continued to ignore communications from Moonlight.

(e)  Threatening to "mothball" the Resort at the end of the 2008-2009 ski season.

(f)  During the Spring of 2009, refusing to honor previously executed contracts between Moonlight and Resort property owners for the leaseback of their residences to Moonlight to the

detriment of Moonlight.

Exh. 1, ¶¶ 162-168.  *See also*, attached Exhibit 3, Affidavit of Gerrit Cormany dated December 4, 2009, ¶¶ 24-33.

56.  By the Spring of 2009, Lehman Brothers had ceased all efforts to sell the Resort and was actively threatening to halt all funding, initiate foreclosure proceedings, and shut down the Resort operations.  Exh. 1, ¶ 165.

57.  In late May and into early June, Lehman Brothers renewed efforts to analyze the financial impacts of shutting down the Resort.  Exh. 1, ¶ 166.

58.  In or about June 2009, Lehman Brothers again threatened foreclosure, despite the continuing activities of the Moonlight management team to continue operation of the Resort, and, continued efforts to aggressively search for additional capital and purchasers.  Exh. 1, ¶ 167.

### The June 2009 "Take-It-Or-Leave-It" Forbearance Agreements

59.  On June 8, 2009, Moonlight contacted Mr. Buffa to inquire about the status of the forbearance agreement, and whether a new agreement was being prepared or was ready for circulation.  Mr. Nastasi responded that no new forbearance agreement would be circulated, but rather that Lehman Brothers would use the draft circulated on Christmas Eve and wanted a 30 day forbearance period.  Lehman Brothers indicated the release and waiver of claims language must remain in the forbearance agreement and was non-negotiable.  Exh. 1, ¶ 169.

60.  On June 19, Mr. Nastasi informed Moonlight that he "need[s] a signed copy today or else I have to give our Montana counsel the go-ahead on starting remedies."  Exh. 1, ¶ 170.

61.  Facing both the threat of imminent foreclosure and the need for additional advances of operating capital, Moonlight was forced to acquiesce to Lehman Brothers' superior bargaining

power and execute the Forbearance Agreement presented by Lehman Brothers.  Exh. 1, ¶ 171.

**Lehman's Continuing Efforts to Obtain the Resort**

62.   Although Moonlight had presented a work-out offer on June 10, 2009, which Mr.
Buffa first indicated would be viewed favorably by Lehman Brothers, contrary to Mr. Buffa's
representations, Lehman Brothers did not engage in any substantive conversations regarding the
Moonlight proposal.  Rather, on July 20, 2009, the last day of the forbearance period, Lehman
Brothers rejected the Moonlight proposal and presented the Moonlight Debtors with a "take-it or
leave-it" proposal which was not made in good faith, was inconsistent with previous
representations made to the Moonlight Debtors, and did not include a proposal for long-term
financing as originally promised in 2007.  Exh. 1, ¶¶ 173-175.

63.   The Lehman Brothers' proposal required Mr. Poole to provide Lehman Brothers with
a deed to the Resort in lieu of foreclosure.  Mr. Nastasi, acting on behalf of Lehman Brothers,
gave Moonlight management only hours to agree to the proposed terms or face foreclosure and
loss of the Resort.  Exh. 1, ¶ 176.

64.   Moonlight attempted in good faith to negotiate the terms of Lehman Brothers'
proposal without success.  Exh. 1, ¶ 177.

65.   On July 22, Moonlight acquiesced and executed the Lehman Brothers' July 20
proposal without significant modification.  However, Wayne Cook, an attorney with Lehman
Brothers' outside counsel, Windels Marx, informed Moonlight "that Forbearance Period has
expired." Exh. 1, ¶ 178.

66.   Later in the day on July 22, Mr. Nastasi informed Moonlight via email that while he
received the signed term sheet from Moonlight, "the forbearance period has expired by its terms.

Given the statements made on yesterday's call to the effect that you would be willing to sign the term sheet even though the deal set forth therein is not acceptable to you because the term sheet is non-binding, we are not comfortable discussing and/or negotiating documentation of the deal set forth in the term sheet unless and until we are able to mutually execute a letter agreement setting forth, at a minimum, the following: (1) borrower parties acknowledge that the forbearance period has expired and that lender is entitled to exercise all rights and remedies. (2) Borrower parties acknowledge that lender is pursuing foreclosure simultaneously with negotiation of the deed-in-lieu documents and that foreclosure proceedings will not be dismissed until the deed-in-lieu transaction has closed. (3) Borrower parties renew the waivers, releases and covenants not to sue set forth in the forbearance agreement. We expect to send you a draft letter agreement in the next day or so." Exh. 1, ¶ 179.

67. Between the start of negotiations on the loan extension agreements beginning in early March 2008, through the time Moonlight executed the Forbearance Agreement in June 2009, Lehman Brothers had extraordinary leverage over Moonlight. This leverage was a direct result of Lehman Brothers' failure to honor its prior commitments to Moonlight. Moonlight management felt that Moonlight was being slowly asphyxiated by Lehman Brothers' actions. Moonlight continually had a proverbial gun to its head and was not in a position to effectively negotiate with Lehman Brothers. Moonlight's only choice was to face loss of the Resort and damage to its customers, employees, and vendors, or to acquiesce to Lehman Brothers' demands, including the releases and waivers of claims they insisted that Moonlight give. Exh. 1, ¶ 180.

In addition to the Moonlight Debtors' above Statement of Genuine Issues, Defendants Poole, Six Shooter, JVLP, Anderson, Aardvark, Frontier and Moonlight Basin Holdings, LLC

filed the following separate statement:

## STATEMENT of GENUINE ISSUES of FACT

1.  Lee Poole is a resident of Madison County, Montana.  He is the primary decision maker for JVLP, L.L.C., Six Shooter, L.L.C., Pool Holdings, L.L.C., Moonlight Basin Holdings, L.L.C., Moonlight Basin Mezz, L.L.C., and Moonlight Basin Ranch, LP. (Poole Affidavit, ¶¶ 2, 3, and 4)

2.  Tim William Anderson is a resident of Gallatin County, Montana. He is the sole owner of Aardvark, L.L.C., a Montana limited liability company. (Anderson Affidavit, ¶¶ 2 and 3)

3.  Lee Poole is Tim William Anderson's father-in-law. (Anderson Affidavit, ¶ 2)

4.  Prior to September 7, 2007, Six Shooter, L.L.C.'s, JVLP, L.L.C.'s, and Aardvark, L.L.C.'s assets were unencumbered. (Poole Affidavit, ¶9; Anderson Affidavit, ¶ 5)

5.  Prior to September 7, 2007, Lee Poole was not a personal guarantor on any debt owed by Moonlight Basin Ranch, LP, or any entity associated with it. (Poole Affidavit, ¶ 9)

6.  In the Spring of 2007, Moonlight Basin Ranch, LP began negotiations with Lehman Commercial Bank. Lee Poole was a participant in those negotiations. He conducted those negotiations from Madison County, Montana. At no time did he travel to New York for the purpose of conducting those negotiations. (Poole Affidavit, ¶ 5)

7.  Tim William Anderson was asked to sign the loan closing documents, including a Security Agreement on behalf of Aardvark, L.L.C. and a Pledge Agreement.  (Anderson Affidavit, ¶¶ 6 and 7)  He did not receive any payment in exchange for his pledge or for Aardvark's pledge.

51

(Anderson Affidavit, ¶ 8)

8.  Tim William Anderson did not travel to New York or any other state for the purpose of negotiating the loan documents.  He signed the loan documents in Montana. (Anderson Affidavit, ¶ 12)

9.  Lehman Brothers representatives made the following statements to Lee Poole in person and in writing:

(a)  Lehman Brothers would sell Moonlight Basin resort within 10-12 weeks;

(b)  The sale price for Moonlight Basin resort would be between $300 and $400 million; and

(c)  If Lehman Brothers was unable to sell the resort within that time frame, it would provide long-term financing to Moonlight Basin Ranch, LP and Moonlight Basin Mezz, L.L.C. (Poole Affidavit, ¶ 6)

10.  If Lehman Brothers had not made those representations to Lee Poole, he would not have signed the Investment Advisory Agreement, Senior Loan, Mezz Loan, Sponsor Carve Out Guaranties, Environmental Indemnity Agreements, the Pledges, or the Security Agreements, on his behalf or his companies behalf (Poole Affidavit, ¶ 7)

11.  Moonlight Basin Ranch, LP and Moonlight Basin Mezz, L.L.C. were unable to make their payments under the loan agreements as scheduled. As a result, negotiations were commenced with Lehman Commercial Paper, Inc. and Lehman Brothers Holdings, Inc. to secure the long-term financing previously promised. Lee Poole was involved to some extent with those negotiations. (Poole Affidavit, ¶ 10)

12.  As guarantor, Lee Poole signed the Senior Loan Extension Agreement, Mezz Loan

Amendment, Senior Forbearance Agreement, and Mezz Forbearance Agreement. Lee Poole signed those agreements believing he had no choice because the loans were not paid due to Lehman's failure to fulfill its promises to him and his companies. (Poole Affidavit, ¶ 11)

13.  In 2008 and 2009, Tim William Anderson was asked to sign various documents in connection with Moonlight Basin Ranch, LP's and Moonlight Basin Mezz, L.L.C.'s loan extensions.  Neither he nor Aardvark, L.L.C. received any money in exchange for the execution of those documents. (Anderson Affidavit, ¶ 9)

14.  Tim William Anderson was advised that Lehman Commercial Paper, Inc. and Lehman Brothers Holdings, Inc. were insisting on his execution of the Post Loan Closing Documents in 2008 and 2009.   Moonlight Basin Ranch, LP and Moonlight Basin Mezz, L.L.C. therefore asked that Tim William Anderson sign those documents. (Anderson Affidavit, ¶ 10)

15.  Tim William Anderson did not believe he had any choice but to sign the Post Loan Closing Documents. He felt that he would lose his company and its assets if he failed to do so. (Anderson Affidavit, ¶ 11)

16.  Lee Poole signed the Post Loan Closing Documents based upon the belief that he would lose his interest in his companies, his job, and his source of income. (Poole Affidavit, ¶ 13)

17.  On the 12th day of January, 2010, Moonlight Basin Ranch, LP and some of its subsidiaries entered into a Senior Secured Super Priority Debtor in Possession Credit Agreement. A copy of that Agreement is . . . marked [as] Exhibit 1, and incorporated herein by reference.

18.  The Senior Secured Super Priority Debtor in Possession Credit Agreement provided for Moonlight Basin Ranch, LP's borrowing of an additional $24 million from Lehman

Commercial Paper, Inc.  That additional borrowing capacity was secured by Moonlight Basin

Ranch, LP's assets.  (Poole Affidavit, ¶ 16)

19.  Lee Poole was not asked, as a guarantor, to consent to the agreement.  Lee Poole did

not give his consent to that agreement as a guarantor.  Lee Poole did not guarantee the

performance of that agreement. (Poole Affidavit, ¶ 17)

20.  Lehman Commercial Paper, Inc. commenced a foreclosure action against the

Defendants in the Montana Fifth Judicial District Court, Madison County on September 11,

2009.  The Nondebtor Defendants filed an answer to that complaint on November 2, 2009.

(Poole Affidavit, ¶ 18, Exhibit 2)

21.   Nondebtor Defendants incorporate herein Debtor Defendants'  Statement of Genuine

Issues of Material Fact and the exhibits attached to it, including the affidavits of Russ McElyea

and Gerrit Cormany.

22.  Nondebtor Defendants deny all facts set forth in Plaintiffs' Statement of Undisputed

Facts which attempt or purport to summarize the terms of the loan documents and the post loan

closing documents. Those documents speak for themselves and are attached to the affidavit of

Lee Poole.

## SUMMARY JUDGMENT

Summary judgment is governed by FED.R.BANKR.P. 7056.  Rule 7056, incorporating

FED.R.CIV.P. 56(c), states that summary judgment "should be rendered if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law."  "The

proponent of a summary judgment motion bears a heavy burden to show that there are no

disputed facts warranting disposition of the case on the law without trial." *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997) (quoting *Grzybowski v. Aquaslide "N' Dive Corp. (In re Aquaslide "N" Dive Corp.)*, 85 B.R. 545, 547 (9th Cir. BAP 1987)).  The manner in which this burden is proven depends on which party has the burden on a particular claim or defense at the time of trial.

> If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence–using any of the materials specified in Rule 56(c)–that would entitle it to a directed verdict if not controverted at trial. Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery.  If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 330-34, 106 S.Ct. 2548, 2557, 91 L.Ed.2d 265  (1986) (Brennan dissent) (citations omitted).  *See also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-06 (9th Cir. 2000) (discussing burdens for withstanding summary judgment).

When seeking summary judgment, the moving party must initially identify those portions of the record before the Court which it believes establish an absence of material fact.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving party adequately carries its burden, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial." *Kaiser Cement Corp. v. Fischback & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986), *cert. denied*, 469 U.S. 949 (1986); FED.

55

R. Civ. P. 56(e).  *See also Frederick S. Wyle Prof'l. Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985) ("the opponent must affirmatively show that a material issue of fact remains in dispute").  That is, the opponent cannot assert the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  Moreover, "[a] party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

      To demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge and the facts set forth therein must be admissible into evidence.  *Aquaslide*, 85 B.R. at 547.  All reasonable doubt as to the existence of genuine issues of material fact must be resolved against the moving party.  *Liberty Lobby,* 477 U.S. at 247-48, 106 S.Ct. at 2509.  However, "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv.*, 809 F.2d at 630 (citing *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510).  "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit.  The materiality of a fact is thus determined by the substantive law governing the claim or defense." *Id*.

      If a rational trier of fact might resolve disputes raised during summary judgment proceedings in favor of the nonmoving party, summary judgment must be denied.  *T.W. Elec. Serv.*, 809 F.2d at 630; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 202 (1986).  Thus, the Court's ultimate inquiry is to determine whether the "specific facts" set forth by the nonmoving party, viewed along with the undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict

in its favor based on that evidence. *T.W. Elec. Serv.*, 809 F.2d at 631. In the absence of any disputed material facts, the inquiry shifts to whether the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53.

## CONTENTIONS of the PARTIES

The Plaintiffs contend that all five of the Releases are valid and enforceable and thus request judgment declaring that (i) the Loan Documents are valid, binding and enforceable; (ii) Lenders have valid, liquidated, and non-contingent claims for all amounts due under the Loan Documents, and Defendants have no valid setoffs, counterclaims, or defenses to these claims; and (iii) Lenders have valid, perfected, and enforceable first-priority mortgage and security interests related to Defendants' property. The Moonlight Debtors counter that the Plaintiff's Motion for Summary Judgment should be denied because material facts are in dispute that preclude summary judgment. In particular, the Moonlight Debtors assert that disputed issues exist as to whether Lehman owns the loans for which they now seek a declaratory judgment, whether the loans were procured by misrepresentations and fraud, rendering all subsequent transactions a legal nullity, whether Lehman caused the Moonlight Debtors' economic duress that forced the Moonlight Debtors to execute unconscionable releases which should be voided, and whether the totality of the facts and circumstances surrounding the execution of the Releases make those same Releases unconscionable contracts of adhesion. The Defendants also contend that Montana law should govern the issues at hand, despite the fact that the relevant agreements contain a choice-of-law provision specifying that New York law applies.

The Nondebtor Defendants, consisting of Moonlight Basin Holdings, LLC, Poole, Six Shooter, JVLP, Anderson, Aardvark and Frontier echo the Moonlight Debtors' arguments in

opposition to summary judgment and further argue that the post loan closing documents were not signed by all Nondebtor Defendants, that the Plaintiffs have failed to establish any facts proving that Poole has breached the Sponsor Carve Out Guaranties, and that the Sponsor Carve Out Guaranty has been exonerated.

## DISCUSSION

1.      Choice of Law.

The Defendant parties argue that the Court's summary judgment analysis is governed by Montana rather than New York law, even though the various contracts between the parties contain choice-of-law provisions specifying New York law will apply.  The Moonlight Debtors argue, and the Plaintiffs do not dispute, that the choice-of-law analysis is a two step process: (1) which choice of law rules control; and (2) which states' law applies.

 Bankruptcy courts apply federal common law choice-of-law rules to determine the enforceability of a contractual choice-of-law provision, even when resolution of the underlying dispute turns on state law.  *Mandalay Resort Group v. Miller*, 292 B.R. 409, 413 (9th Cir. BAP 2003).  "Federal common law follows the approach of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1969)."  *Schoenberg b. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777 (9th Cir. 1991).  The principles governing analysis of choice-of-law provisions appear in RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187, titled "Law Of The State Chosen By The Parties," which provides as follows:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and

duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

The Defendants do not argue that § 187(1) or § 187(2)(a) are applicable to this case. Rather, relying on § 187(2)(b), the Defendants argue that Montana law should apply because New York law is contrary to a fundamental policy of Montana in that "New York imposes a more difficult burden to meet the unconscionability test."  Montana law, unlike New York law, "does not emphasize the commercial nature of the transaction or the relative size or sophistication of the parties" when considering an unconscionability defense.  Moonlight Debtors' Opposition, pp 9-10.  The Court disagrees.  As persuasively argued by the Plaintiffs, in Montana, "[a]lthough courts have readily applied the doctrine of unconscionability to contracts between consumers and skilled businessmen, they are reluctant to rewrite the terms of a contract between businessmen themselves."  *All-States Leasing Co. v. Top Hat Lounge, Inc.*, 198 Mont. 1, 6, 649 P.2d 1250 (1982).  The case of *Woodruff v. Bretz, Inc.*, 2009 MT 329, 353 Mont. 6, 218 P.3d 486, upon which the Defendants rely, illustrates this point.  In *Woodruff*, a consumer purchased a motor home from a motor home dealership.  *Woodruff*, ¶ 2.  The consumer later learned that the motor home was contaminated with pet urine.  *Id*.  When the consumer filed suit against the dealer, the dealer sought to compel arbitration under an arbitration clause.  *Woodruff*,

59

¶ 3.  In refusing to compel arbitration under an arbitration clause, the Supreme Court of Montana

explained:

> Bretz relies heavily on *Denton v. First Interstate Bank of Commerce*, 2006 MT
> 193, 333 Mont. 169, 142 P.3d 797, in arguing that the purchase contract is not a
> contract of adhesion. *Denton*, however, is readily distinguishable from the present
> case in ways that favor Woodruff. Denton was a "sophisticated business person"
> who, as a "valued FIB client," was in a strong bargaining position. *See Denton*, ¶
> 33. By contrast, Woodruff was the weaker party to the transaction with Bretz and
> had a "relative lack of sophistication" regarding arbitration clauses and their
> consequences. Cf. *Kloss*, ¶ 37. Denton knew the contents of his contract, having
> "studied" it prior to signing it. *See Denton*, ¶ 34. By contrast, Woodruff is an
> ordinary citizen who was unfamiliar with and did not have an understanding of the
> arbitration process referred to in the contract.

*Woodruff*, ¶ 10.

The Defendants are all clearly experienced commercial entities and businessmen,

represented by experienced and sophisticated legal counsel at all relevant times.  Because the

Defendants have not established any fundamental policy difference in the laws of Montana and

New York with respect to the treatment of sophisticated commercial lenders and borrowers, this

Court concludes that the law of New York applies to the Plaintiffs' and Defendants' disputes in

this case.

2.      Ownership of the loans at issue.

The Defendants allege that "it is possible that the Lehman Plaintiffs . . . did not, and do

not, own the loans or have the requisite authority to pursue claims."  The Plaintiffs counter that it

is not necessary for this Court to determine whether the Plaintiffs own the loans in order to make

a ruling as to whether the releases are valid.  The Court finds it particularly helpful, and indeed

necessary, to have the proper parties before it.  However, after reviewing the record, the Court

finds that the Plaintiffs do own the loans at issue and they are the proper parties to prosecute this

Adversary Proceeding.

The Defendants state that on September 23, 2008, Lehman informed Moonlight that it was not authorized to execute mortgage lien releases because the Senior Lien had been sold to Bankhaus, A.G.  Days later, Lehman clarified to Moonlight that only the participation rights in the loan had been sold.  No one has ever produced any documentation that Lehman sold the Moonlight loans or that Lehman sold the participation rights to the Moonlight loans and indeed, sometime around November 17, 2008, Lehman was seeking to enforce its rights and remedies under the Moonlight loans by asking Poole to grant deeds in lieu of foreclosure and to enter into a management agreement with Lehman to operate the Moonlight Basin Resort.  As the Defendants concede, Lehman wanted a smooth transition in ownership from the Moonlight Debtors to Lehman.

Also, as explained by the Plaintiffs, September of 2008 was a tumultuous time for Lehman Brothers as it filed its own Chapter 11 bankruptcy on September 15, 2008.  Moreover, the participation of interests in the Loans was allowed under the Loan Agreements and did not create any issue with respect to ownership or the ability to pursue claims.  As explained by Jeffrey Fitts in his Affidavit:

> Notwithstanding the participation of certain interests in the Loans to [Lehman Brothers Bankhaus Aktiengesellschaft], the Lenders retained all of the rights and duties of lender under the underlying Loan Documents . . . Lenders remained the only parties in privity with the various borrowers of the Loans, and thus only the Lenders had the authority to exercise the rights and remedies of the lender under the Loan Documents . . . [and e]ffective February 4, 2010, the participation interests of Bankhaus in the Loans were terminated and as of such date, Bankhaus no longer holds any interest in the Loans.

3.       The Releases.

The five releases at issue in the Plaintiffs' Motion for Summary Judgment are contained

in the:

> Senior Extension Agreement, June 5, 2008, Exhibit BB to the Plaintiffs' Complaint
> Mezz Ratification and Amendment, June 5, 2008, Exhibit CC to the Plaintiffs' Complaint
> Advisory Amendment, June 5, 2008, Exhibit AA to the Plaintiffs' Complaint
> Senior Forbearance Agreement, June 19, 2009, Exhibit GG to the Plaintiffs' Complaint
> Mezz Forbearance Agreement, June 19, 2009, Exhibit HH to the Plaintiffs' Complaint

The June 5, 2008, Senior Extension Agreement between LCPI (by assignment from

LBCB), as administrative agent for the Secured Parties, and MBranch provides in part:

> (ii)    No Waiver.  Administrative Agent's agreement to the Extension set forth in
> clause (i) above does not constitute a waiver of any breach, default, or
> noncompliance under the Loan Documents other than the Events of Default
> described in the letter entitled "Notice of Default; Reservations of Rights", dated
> as of March 25, 2008 from Administrative Agent to Borrower and Sponsor, which
> Administrative Agent hereby waives.

> (xv)    Reaffirmation of Guaranties and Environmental Indemnity.  Each of the
> Sponsor and each Subsidiary Guarantor hereby ratifies, reaffirms, confirms and
> acknowledges all of its representations, covenants, agreements, obligations and
> liabilities under, and the terms and conditions of, the Costs Overrun Guaranty, the
> Sponsor Carve Out Guaranty, the Subsidiary Guaranty and the Environmental
> Indemnity, to which each is a party as amended hereby, and agrees to continue to
> be bound thereby and perform thereunder.

> (xvii)   General Release; Covenant No to Sue.  In consideration of
> Administrative Agent's execution and delivery of this Extension Agreement,
> Borrower, Sponsor, each Guarantor and each Loan Party on behalf of itself and its
> members, partners, shareholders, agents, representatives, officers, directors,
> advisors, employees, subsidiaries, affiliates, successors and assigns (each
> individually a "Releasor," and collectively the "Releasors") hereby forever
> waives, releases, and discharges, to the fullest extent permitted by law, each of the
> Releasees (as hereinafter defined) from any and all claims (including, without
> limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions,
> causes of action, suits, debts, accounts, interests, liens, promises, warranties,
> damages and consequential damages, demands, agreements, bonds, bills,
> specialties, covenants, controversies, variances, trespasses, judgments, executions,
> costs, expenses or claims whatsoever (collectively, the "Claims"), that such
> Releasor now has or hereafter may have, of whatsoever nature and kind, whether

known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, against Administrative Agent in any capacity (whether as administrative agent, lender or otherwise) and its respective members, partners, affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and its respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing (collective, the "Releasees"), based in whole or in part on facts, whether or not now known, existing on or before the date of this Extension Agreement, that relate to, arise out of or otherwise are in connection with: (i) the Loan Agreement, any of the other Loan Documents, or transactions contemplated thereby or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between Borrower, Sponsor, each Guarantor and each Loan party, on the one hand, and Administrative Agent, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any other Claims whatsoever against any Releasee.  In entering into this Extension Agreement, the Releasors consulted with, and have been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agree and acknowledge that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity hereof.  The provisions of this Section shall survive the termination of this Extension Agreement, the Loan Agreement, the other Loan Documents and payment in full of the Loan.

Release 1, Exhibit BB.  The Senior Extension Agreement was signed by an agent of LCPI and the Borrower (Poole on behalf of MBRanch).  The Senior Extension Agreement was also signed by the  following Guarantors for purposes of agreeing to the provisions of paragraphs (xv) and (xvii):  Poole, individually and on behalf of Spa, Golf, Basin, Lodge, Treeline, Mountain Top and Lone Mountain.

The Mezz Ratification and Amendment between Mezz and LBHI contains a Reaffirmation of Sponsor Carve Out Guaranty (Section 6), a Reaffirmation of Environmental Indemnity (Section 7) and a Reaffirmation of Other Loan Documents (Section 8).  Section 8 provides that "[e]ach Loan Party and each Pledgor hereby ratifies, reaffirms, confirms and

acknowledges all of its representations, covenants, agreements, obligations and liabilities under, and the terms and conditions of, all of the other Loan Documents to which it is a party as amended hereby, and agrees to continue to be bound thereby and perform thereunder."  Section 9 of the Mezz Ratification and Amendment contains a General Release; Covenant Not to Sue provision that is very similar to the General Release; Covenant Not to Sue provision set forth in the Senior Extension Agreement:

General Release; Covenant Not to Sue.  In consideration of Lender's execution and delivery of this Amendment, Borrower, Sponsor and each Loan Party on behalf of itself and its members, partners, shareholders, agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns (each individually a "Releasor," and collectively the "Releasors"), hereby forever waives, releases, and discharges, to the fullest extent permitted by law, each of the Releasees (as hereinafter defined) from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever (collectively, the "Claims"), that such Releasor now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, against Lender in any capacity (whether as administrative agent, lender or otherwise) and its respective members, partners, affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and its respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing (collective, the "Releasees"), based in whole or in part on facts, whether or not now known, existing on or before the Amendment Date, that relate to, arise out of or otherwise are in connection with: (i) the Loan Agreement, any of the other Loan Documents, or transactions contemplated thereby or any actions or omissions in connection therewith, (ii) any aspect of the dealings or relationships between Borrower, Sponsor, each Loan party, on the one hand, and Lender, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof, or (iii) any other Claims whatsoever against any Releasee.  In entering into this Amendment, the Releasors consulted with, and have been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agree and acknowledge that the

validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity hereof.  The provisions of this Section shall survive the termination of this Amendment, the Loan Agreement, the other Loan Documents and payment in full of the Loan.

Release 2, Exhibit CC.  The Mezz Ratification and Amendment is signed by an agent of LBHI and the Borrower (Poole on behalf of Mezz).  The Mezz Ratification and Agreement is also signed by Poole, as Sponsor, for purpose of agreeing to various Sections of the Mezz Ratification and Amendment, including Section 9, the General Release; Covenant Not to Sue.  The Mezz Ratification and Amendment is also signed by the following "Other Loan Parties:" Basin, Moonlight Basin Ranch, Inc., MBRanch, Six Shooter, JVLP, Anderson and Aardvark.

The June 5, 2008, Advisory Amendment between Lehman Brothers, Inc. and MBRanch provides in paragraph 7:

> **Release of Claims**.  By executing this Agreement, (i) [MBRanch] acknowledges that it has no claims or defenses against Lehman Brothers[, Inc.] in any capacity and its respective members, partners, affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and its respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing that relate to, arise out of or otherwise are in connection with the Advisory Agreement, any transactions contemplated thereby or any actions or omissions in connection therewith, or any aspect of the dealings or relationships between [MBRanch] and Lehman Brothers[, Inc.], and (ii) [MBRanch] releases Lehman Brothers[, Inc.] from any such claims, whether or not now known, existing or arising out of circumstances that have occurred on or prior to the Amendment Date.

Release 3, Exhibit AA.  The Advisory Amendment Release is signed by an agent of LBI and Poole, on behalf of MBRanch.

The Senior Forbearance Agreement contains reaffirmations of the loan documents and obligations by MBRanch and reaffirmation by the Pledgors.  The Senior Forbearance Agreement

also contains the following applicable provisions:

8.   <u>Release and Covenant Not to Sue</u>.

(a)   In order to induce Lender [LCPI] to enter into this Agreement, and in consideration thereof, Borrower [MBRanch] and Pledgors [Poole, Anderson and Mountain Top] hereby jointly and severally release and discharge absolutely Lender, its predecessors, successors and assigns, and their respective officers, directors, shareholders, partners, agents, employees, servants, related corporations, subsidiaries, affiliates, partnerships, representatives, or other entities related thereto and its attorneys (collectively, "Released Parties") of and from any and all claims, actions, suits, warranties, promises, agreements covenants, rights, demands, damages, liabilities, omissions, obligations or Obligations, of any kind, against Released Parties, including without limiting the generality of the foregoing, any condition, act, omissions, event, contract, liability, obligation, claim, cause of action, damage, defense (to the extent permitted by law), circumstance or matter of any kind whatsoever, in each case, which existed, arose or occurred at any time prior to the date of this Agreement in connection with the Loan, or which could arise after said date because of any of the foregoing which existed at said date.

(b)   Borrower and Pledgors shall not directly or indirectly institute, prosecute, or air or assist in, or cooperate with, the institution or prosecution of any action, suit, hearing or other proceeding of any kind, nature or character, at law or in equity, against Released Parties, in order to collect, enforce, declare, assert establish or otherwise raise any defense, claim, cause of action, liability, or obligation (i) which is within the scope of those released in Paragraph 8a, or (ii) which arises out of any fact, defect, contract, condition, obligation, event, action, omission, circumstance, or other matter of any kind which is the basis for any such defense, claim, cause of action, liability, or obligation released hereunder. This Agreement shall constitute a complete defense to any claim, cause of action, liability or obligation released hereunder.

(c)   Nothing in this Agreement, or in the discussions and negotiations of the parties which preceded its execution, shall be directly or indirectly construed, or be admissible in any legal action or proceeding or otherwise, as an admission by Released Parties that any obligation, liability, contract, claim or cause of action exists which is within the scope of those released within this Paragraph 8.

(d)   Without limiting any of the above, Borrower and Pledgors hereby unconditionally waive:

Any right which they might have or acquire to limit or affect in any way

66

the discretion of Lender as to the order, priority or manner in which Lender enforces any of its rights, remedies or claims under the Loan Documents or in connection with the Loan transaction.

Borrower and Pledgors acknowledge that their waivers and releases contained herein constituted a material inducement to Lender to enter into this Agreement, and that Lender would not have done so but for those waivers and releases and Lender's expectation that the same are valid and enforceable in any an all events.

(e)    Waiver of Rights.    Borrower and Pledgors acknowledge and agreed that inter alia, there is currently the Maturity Default under the Loan Documents, and that by reason of the Maturity Default Lender is entitled, at any time in the future after a Termination Event, to exercise any and all of its rights and remedies thereunder.  In addition, without creating any implication that any of the following provisions are applicable, Borrower, Guarantors, and Pledgors hereby expressly and irrevocably disclaim and renounce any right and hereby irrevocably waive any defense, protection or right (a) to object to the commencement by Lender of any additional or further action to judicially foreclose any lien or security interest granted by Borrower upon the Premised and any other item of collateral or the filing by Lender of any pleadings intended to consolidate the subject matter of any action with any cause of action to realize upon all or any item of collateral; and (b) any rights of redemption with respect to foreclosure collateral other than the Premised to the extent such waiver is permitted by law.  Notwithstanding the above, Poole does not waive any defense under the Carve Out Guaranty and as of the date hereof, Lender has no actual knowledge of any claim thereunder.

9.    Covenant of Noninterference and Cooperation.  Borrower and Pledgors jointly and severally, covenant and agree that none of them shall take any action of any kind or nature whatsoever, either directly or indirectly, to oppose, impede, obstruct, hinder, frustrate, enjoin or otherwise interfere with the proper exercise by Lender of any of Lender's rights and remedies, at law or in equity, against or with respect to the Loan, the Premises, any of the Collateral, this Agreement, or any of the Loan Documents, or Lender's rights to cure any defaults thereunder or to purchase the same, at law or in equity, and shall not, either directly or indirectly cause any other Person to take any of the foregoing actions; and Borrower agrees to indemnify the Lender from any loss, cost, or damage, including but not limited to attorneys fees due to a breach of this covenant and the covenants contained in section 8 of this Agreement.

10.    Termination of Cost Overrun Guaranty.  Lender hereby agrees to terminate the Cost Overrun Guaranty and Poole is released of all obligations and

guarantees set forth therein.

11.   <u>Advice of Counsel</u>.  Each of Borrower and Pledgors acknowledge that it has sought the advice of, and has been advised by, legal counsel of their choice, in connection with the negotiation of this Agreement, and that each signatory hereto has willingly entered into this Agreement with full understanding of the legal and financial consequences of this Agreement.

\* \* \*

15.   <u>Integration; Interpretation</u>.  The Loan Documents, including this Agreement, contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein, and supersede all prior negotiations.  The Loan Documents, including this Agreement, shall not be modified except by written instrument executed by all parties.  Any reference to the Loan Documents in any of the Loan Documents includes any amendments, renewals or extensions executed by Borrower and Lender, and this Agreement.

Release 4, Exhibit GG.  The Senior Forbearance Agreement is signed by MBRanch as the

Borrower, LCPI as the Lender and Poole, Anderson and Mountain Top as Pledgors.  The Senior

Forbearance Agreement is not signed by the Guarantors – Poole, Spa, Golf, Basin, Lodge,

Treeline, Mountain Top or Lone Mountain.

Paragraph A of the Recitals to the Senior Forbearance Agreement recites that the term

"Loan Documents" has the meaning ascribed to such term in the September 7, 2007, Credit

Agreement.  The September 7, 2007, Credit Agreement defines the term as the Credit

"Agreement, the Note, the Subsidiary Guaranty, the Sponsor Carve Out Guaranty, the Cost

Overrun Guaranty, the Environmental Indemnity, the Collateral Documents, and all other

documents evidencing or securing Obligations and any agreements between any Loan Party and

one or more of the Agents entered into in connection with the Transactions."  *See* Exhibit A.

Finally, the Mezz Forbearance Agreement between Mezz and LBHI, like the Senior

Forbearance Agreement, contains reaffirmations of the loan documents and obligations by Mezz

and reaffirmation by the Pledgors.  The Mezz Forbearance Agreement also contains many of the other provisions set forth above but does not include a Termination of Cost Overrun Guaranty. Release 5, Exhibit HH.  However, the Mezz Forbearance Agreement is not signed by a single party.  The Court cannot conclude that Release 5 contained in the Mezz Forbearance Agreement is valid and enforceable when it contains not a single signature.  In other words, the Plaintiffs cannot sustain their summary judgment burden with respect to Release 5 when Release 5 is not signed by the parties against whom enforcement is sought.  Thus, the Plaintiffs' Motion for Summary Judgment as to the Release in the Mezz Forbearance Agreement is denied.

a.      Economic Duress or Business Compulsion.

The Moonlight Debtors are not claiming the releases are invalid because of fraud. Rather, the Moonlight Debtors assert that the Releases should be declared invalid and set aside because at the time the Moonlight Debtors executed the Releases, they were under "extreme economic duress," caused by Lehman.  In particular, the Moonlight Debtors argue that while they knew of the Releases and understood their effect, the Moonlight Debtors in no way entered into the Releases voluntarily.  Moonlight Debtors' Opposition to Motion for Summary Judgment, dkt 39, p.11.

In support of their opposition, the Moonlight Debtors argue that the New York case law relied upon by the Plaintiffs, namely, *Hogeland v. Sibley, Lindsay & Curr. Co.*, 42 N.Y.2d 153, 397 N.Y.S.2d 602, 366 N.E.2d 263, *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 306 (S.D.N.Y.1997), *aff'd without published opinion*, 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998), and *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F.Supp.2d 178, 190-192 (S.D.N.Y.2008), is distinguishable and that "Moonlight has presented ample evidence of

69

economic duress[.]" Moonlight Debtors' Opposition, dkt 39, p.13-14.

The Moonlight Debtors' "ample evidence" regarding economic duress is that the Moonlight Debtors were in default under the terms of the Senior Loan and the Mezz Loan, and as a result, the Plaintiffs were threatening to pursue their remedies under the Senior and Mezz Loans. The remainder of the Moonlight Debtors' arguments go to the Plaintiffs' actions prior to the date that the parties signed the Releases. The Moonlight Debtors do not cite to a single New York case in support of their economic duress argument, other than in the context that they have not waived their economic duress defense. Without a single citation to any meaningful legal authority, the Moonlight Debtors conclude that they have established a question of fact regarding the Releases.

The Nondebtor Defendants concede in their Opposition that even in Montana, "[e]vidence of the pressure of financial circumstances is not sufficient." Opposition to Motion for Summary Judgment, dkt 41, p.8. Citing to *Sosnoff v. Carter*, 165 A.D.2d 486, 491, 568 N.Y.S.2d 43 (1991), the Nondebtor Defendants argue:

> "The applicable law is clear ... [a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will" (*Austin Instrument v Loral Corp.*, 29 NY2d 124, 130). A demonstration of economic duress can be made by proof that one party to a contract has threatened to breach the agreement by withholding performance unless the other party agrees to some further demand (*805 Third Ave. Co. v M.W. Realty Assocs.*, 58 NY2d 447, 451; *Austin Instrument v Loral Corp., supra*). This showing of a threatened violation of the contractual obligations by itself ordinarily will not suffice. However, economic duress is established when the facts show that such breach will result in an irreparable injury or harm. (13 Williston, Contracts § 1617, at 704-705 [3d ed]; *Austin Instrument v Loral Corp., supra*, at 130.)

The above citation by the Nondebtor Defendants is curious because in this case, the

Plaintiffs were not threatening to breach their agreements with the Moonlight Debtors.  It was the

Moonlight Debtors who had already breached the Senior Loan agreement and the Mezz Loan

agreement by failing to make timely payment.  Moreover, the defendant in *Sosnoff v. Carter*

showed that he had explored other financing possibilities without success.  No such showing was

made here.  Indeed, the Nondebtor Defendants state that "Mr Anderson signed the loan

documents simply because he was asked to do so."  *Id.*, p.10.  Anderson's argument that a

request by Lehman that Anderson sign the documents somehow equates to economic duress is

simply nonsensical.  The Nondebtor Defendants also make the curious argument that the dispute

in this case did not arise until mid-July 2009.  *Id.*, p.12.

The Defendants' economic duress theory rests solely on their contention that the

Moonlight Debtors':

> [E]xtreme financial situation was caused by Lehman's fraud.  Mr Poole signed the
> loan documents based upon the representations that" 1) Lehman could sell
> Moonlight Basin Resort ("Resort") in 10 to 12 weeks; 2) the Resort could be sold
> for between $300 and $400 million; and 3) if the Resort did not sell in that time
> frame, it would provide Moonlight with long term financing.  These
> representations turned out to be false.  The Resort did not sell and Lehman did not
> provide long term financing.

Nondebtor Defendants' Opposition, p.10.

The alleged fraud that the Defendants complain of occurred long before the Releases and

the Defendants knew at the time the Releases were entered into that LCPI, LBHI, LBCB and LBI

had not sold the Moonlight Basin Resort.  However, even if the Defendants could somehow

prove that they were unaware of the alleged fraud until a later date, the Supreme Court, Appellate

Division, First Department, New York just this month explained:

> [A] claim for fraud within the scope of a release can be released even if it is

unknown to the releasor, and notwithstanding that the releasee did not make full disclosure of its wrongdoing before the release was granted (*see Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527-528 [2d Cir.1985]; *Alleghany Corp. v. Kirby*, 333 F.2d 327, 333 [2d Cir.1964], *adhered to on reh*. 340 F.2d 311 [1965] [en banc], *cert. dismissed* 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 [1966]; *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F.Supp.2d 178, 190-192 [S.D.N.Y.2008] ). As stated in the last cited case, "[a] 'general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud' " (*id.* at 191, quoting *Sotheby's, Inc. v. Dumba*, 1992 WL 27043, *7, 1992 U.S. Dist. LEXIS 965, *21 [S.D.N.Y.1992] ).  Further, a release that, by its terms, extinguishes liability on any and all claims arising in connection with specified matters is deemed to encompass claims of fraud relating to those matters, even if the release does not specifically refer to fraud and was not granted in settlement of an actually asserted fraud claim (*see Consorcio*, 544 F.Supp.2d at 192 [where "language of remarkable breadth makes clear the parties' intent to release all claims, including those of fraudulent inducement," court held that "(e)ven if no semblance of fraud had come to light before the releases were executed, it is clear that the parties intended to settle fraud claims"] [citations, internal quotation marks, ellipses and brackets omitted] ).

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, – N.Y.S.2d –, 2010 WL

2196425, *5 (June 3, 2010).

*Centro Empresarial* also holds that the foregoing principles apply, even where the

releasee owes certain fiduciary duties to the releasors:

[T]he foregoing principles apply (at least among sophisticated parties advised by counsel) even where the releasee is a fiduciary (*see Alleghany Corp.*, 333 F.2d at 328 [enforcing release granted to defendant Kirby by corporation of which he had been an "officer( ) and director( )"]; *Consorcio*, 544 F.Supp.2d at 191 [" 'the policy underlying *Alleghany* and *Bellefonte* applies with equal force to fiduciaries' "] [brackets omitted], quoting *Tyson v. Cayton*, 784 F.Supp. 69, 75 [S.D.N.Y.1992] [enforcing boxer's release of his former manager]; *Gaetjens v. Gaetjens, Berger & Wirth*, 151 F.Supp. 701, 704 [S.D.N.Y.1957] [counterclaim against former corporate officer for conversion of corporate funds was barred by release, notwithstanding that corporation did not know of the conversion when release was signed] ).

*Id.*, *6.

To prevail under the circumstances in this case, Plaintiffs must show that the Defendants

had other options when they signed the Releases.  Plaintiffs have sustained their initial burden of

showing that the Defendants had other reasonable alternatives to signing the releases.  The record

shows that the Defendants could have allowed the Plaintiffs to continue with foreclosure and

then assert their claims in the foreclosure action.[5]  The Defendants instead elected to sign the

Releases so that Plaintiffs would not pursue foreclosure.  As explained by the United States

District Court for the Southern District of New York, the existence of an adequate legal remedy

at law will undercut any claim of economic duress.  *Milgrim v. Backroads, Inc.*, 142 F.Supp.2d

471, 476 (S.D.N.Y.2001), citing *Int'l Halliwell Mines, Ltd. v. Continental Copper & Steel Indus.,*

*Inc.*, 544 F.2d 105, 109 (2nd Cir. 1976).

While the Plaintiffs sustained their initial summary judgment burden, the Defendants

failed their burden by failing to show that they had no other choice but to sign the Releases.  The

Defendants have shown that the Moonlight Debtors' dire financial condition compelled the

Defendants to execute the Releases.  However, as previously noted, "[e]vidence of the pressure

of financial circumstances is not sufficient."

b.      Unconscionable Contracts of Adhesion.

Citing to  *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10 534 N.E.2d 824 (1988),

the Plaintiffs note that, in general, for a contract to rise to the level of unconscionable, a moving

party must establish both procedural and substantive unconscionability.  The Nondebtor

---

[5]  The Plaintiffs also assert that the Defendants could have "(i) refinanced their debt with
another party; (ii) sold other properties not subject to [Plaintiffs'] liens; (iii) requested that Lee
Poole pay back the roughly $20 million that he borrowed from Defendants in September 2007 or
otherwise provide Defendants with additional capital; (iv) found a new equity partner; or (v)
sought bankruptcy protection and asserted their claims therein (as they obviously eventually did –
this adversary proceeding is definitive evidence of their ability to litigate their claims)."
Plaintiffs' Reply, dkt 49, p.10.

Defendants agree that New York's law on the Doctrine of Unconscionability, as summarized in

*Gillman*, is similar to Montana's law:

> An unconscionable contract has been defined as one which "is so grossly
> unreasonable or unconscionable in the light of the mores and business practices of
> the time and place as to be unenforceable according to its literal terms. . . . A
> determination of unconscionability generally requires a showing that the contract
> was both procedurally and substantively unconscionable when made–i.e., "some
> showing of an 'absence of meaningful choice on the part of one of the parties
> together with contract terms which are unreasonably favorable to the other party'
> [Internal cites omitted.]

*Id*. at 10.

Under the procedural inquiry, the Court is required to examine the formation of the

contract by focusing on the size and commercial setting of the transaction, the tactics used, the

sophistication of the parties, and the disparity of bargaining power between the parties. The

Moonlight Debtors agree that "[i]n New York there is a presumption of conscionability where

the contract arises in a commercial transaction by business people in a commercial setting under

terms that are standard in the trade." The "archtypical application of this doctrine" of procedural

unconscionability is to "contract[s] of adhesion between a business and a consumer or between a

business and an employee" and "courts have rarely found a clause to be unconscionable in

contracts involving two commercial entities ..." *Reznor v. J. Artist Mgmt., Inc.*, 365 F.Supp.2d

565, 577 (S.D.N.Y.2005). In the case *sub judice*, the Defendants are sophisticated parties who

were represented by very competent legal counsel at all relevant times. Defendants simply have

not overcome New York's presumption of conscionability.

The Court need not address the issue of substantive unconscionability because the

Defendants failed to raise any disputed fact as to procedural unconscionability. However, for

74

purposes of completeness, the Court further concludes that Defendants have failed to assert any facts that would support a claim of substantive unconscionability. A claim of substantive unconscionability requires the Court to look at the terms of the agreement to determine whether they are "unreasonably unfavorable" to the party claiming unconscionability. The undisputed facts show that MBRanch and Mezz defaulted on the Senior and Mezz Loans. The Defendants then signed various Releases so that the Plaintiffs would agree to forego proceeding with their legal remedies. Contrary to the Defendants' position, the Releases in this case do not shock the conscience of the Court.

The Nondebtor Defendants signed the releases and other post-loan closing documents in an effort to eliminate the risk associated with the guaranties, environmental indemnity agreements, pledges and security agreements. After considering the arguments raised by the Nondebtor Defendants, it seems that such Defendants may instead have claims against the Moonlight Debtors for failing to pay the obligations when due.

Neither the Moonlight Debtors nor the Nondebtor Defendants have a claim against the Plaintiffs for unconscionability because they have failed to raise any facts to show procedural unconscionability. Moreover, they have failed to show substantive unconscionability because nothing in the record suggests that the Releases were so "unreasonably favorable" as to constitute a transgression of a strong public policy that overcomes the ordinary presumption of freedom to enter into a contract, however unwise. *Reznor*, 365 F.Supp.2d at 577.

The Moonlight Debtors contend that they have "presented ample evidence of economic duress and unconscionability." The Court disagrees. What the Defendants request in this case is that the Court strip secured creditors of their power to negotiate upon a default under a loan

obligation.  The Defendants request that this Court adopt a position that would force secured lenders to foreclose on their obligations as opposed to negotiating terms that are perhaps more favorable to all parties involved.  The Defendants' arguments have no merit.

4.     Whether Release 4 in the Senior Forbearance Agreement supersedes Release 1 in the Senior Extension Agreement; and whether Release 2 in the Mezz Ratification & Amendment is superseded by Release 5 in the Mezz Forbearance Agreement.

The answer to the latter inquiry of whether Release 2 in the Mezz Ratification & Amendment is superseded by Release 5 in the Mezz Forbearance Agreement is very simple.  The evidence before the Court shows that the Mezz Forbearance Agreement is not enforceable against any of the parties because it is not signed by any of the Defendants in this action.  Based upon the record, the Court does not see a properly executed Mezz Forbearance Agreement that could supersede the Mezz Ratification & Amendment.

The answer to the former inquiry of whether Release 4 in the Senior Forbearance Agreement supersedes Release 1 in the Senior Extension Agreement is not as simple.  Release 1 in the Senior Extension Agreement indicates "Borrower, Sponsor, each Guarantor and each Loan Party on behalf of itself and its members, partners, shareholders, agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns . . . forever waives, releases and discharges . . . "  In contrast, Release 4 in the Senior Forbearance Agreement is narrower in scope and indicates "Borrower and Pledgors hereby jointly and severally release and discharge absolutely . . .".  Significantly, Release 4 also has a non-impairment clause.  The non-impairment clause indicates nothing in the Senior Forbearance Agreement alters or affects any provision, condition or covenant in the Loan Documents unless expressly set forth in the Senior Forbearance Agreement.  The release and covenant not to sue in the Senior Forbearance

Agreement does not expressly alter or impact the general release and covenant not to sue in the Senior Extension Agreement. Absent an express intention for the Senior Forbearance Agreement's release and covenant not to sue to replace the Senior Extension Agreement's general release and covenant not to sue, both releases are valid and in force against the specific parties addressed in each agreement.

     5.    The Nondebtor Defendants' claims involving the Sponsor Carve Out Guaranties, the Pledge Agreements and the Environmental Indemnity Agreements.

     a.    Sponsor Carve Out Guaranties.

The Nondebtor Defendants argue that the Plaintiffs have failed to establish a breach of the Sponsor Carve Out Guaranties. The Sponsor Carve Out Guaranty for the Senior Loan, Exhibit T, and the Mezz Loan, Exhibit V, are signed by Poole. The Plaintiffs do not argue that Poole has breached the Sponsor Carve Out Guaranties. However, Releases 1 and 2, which are releases by "Borrower, [and] Sponsor" and which are signed by Poole, are plainly valid and effective against Poole. Given the foregoing, the Court need not decide whether Release 4 is a release by Poole of his claims and defenses under the Sponsor Carve Out Guaranty under the Senior Loan.

     b.    Pledge Agreements.

The Nondebtor Defendants acknowledge that a default of the Credit Agreements constitutes a default of the respective Pledge Agreements. The Pledge Agreement for the Senior Loan, Exhibit O, is signed by Pledgors MBRanch (with consent by Lone Mountain, Montana Real Estate Company, LLC, Basin, Golf, Lodge, Spa, Mountain Top and Treeline), Mountain Top (with consent of Frontier Stone), Poole (with consent of Six Shooter and JVLP) and

77

Anderson (with consent of Aardvark). The Pledge and Security Agreement to the Mezz Loan, Exhibit Q, is signed by Pledgors Mezz (with consent of Moonlight Basin Ranch, Inc. and MBRanch), Moonlight Basin Holdings, LLC (with consent of Mezz), and Poole (with consent of Six Shooter and JVLP). The signature lines for Anderson and Aardvark on Exhibit Q are blank. Thus, the Pledge and Security Agreement to the Mezz Loan may not be enforceable against Anderson and Aardvark.

Both the Senior Extension Agreement and Mezz Ratification and Amendment contain reaffirmations and ratifications of various guaranties, obligations and liabilities relating to the Senior Loan and the Mezz Loan. However, a question of fact exists as to whether Release 1 is valid and enforceable against the Pledgors. However, the validity of Release 1 as to the Pledge Agreement may not be particularly important because Release 4 is valid and enforceable against Pledgors Mountain Top, Poole and Anderson, all who signed Release 4. The Court also concludes that Release 2 is a valid release of all claims that Moonlight Basin Ranch, Inc., Six Shooter, JVLP and Poole had with respect to the Mezz Pledge Agreement.

c.      Environmental Indemnity Agreements.

Finally, the Nondebtor Defendants argue that summary judgment is not appropriate on any claim under the environmental indemnity agreements. The Environmental Indemnity Agreement to the Senior Loan, Exhibit W, is signed by Indemnitors MBRanch and Poole. The Environmental Indemnity Agreement to the Mezz Loan, Exhibit U, is signed by Indemnitors Mezz and Poole. Releases 1, 2 and 4 are broad and clearly constitute a release of any claims or defenses that MBRanch and Mezz have under the Environmental Indemnity Agreements. However, the Court finds that there is a material question of fact as to whether Poole has released

his claims and defenses under the Environmental Indemnity Agreements.

In sum, the Court finds that Release 1 is valid and effective against MBRanch (the Borrower), and the Guarantors, Poole, Spa, Golf, Basin, Lodge, Treeline, Mountain Top and Lone Mountain.  Release 1 is a release by Poole of any claim or defense he may have asserted under the Sponsor Carve Out Guaranty and is a release by MBRanch of any claim or defense it may have had to the Environmental Indemnity Agreement.  However, because the General Release in the Senior Extension Agreement does not mention Pledgors or Indemnitors and is not signed by any party as a Pledgor or Indemnitor, the Court finds at this time that Release 1 is not necessarily a release of claims and defenses by the Pledgors under the Pledge Agreement. Likewise, the Court cannot conclude at this time that Release 1 is a release by Poole of his claims and defenses under the Environmental Indemnity Agreement.

Similarly, Release 2 is valid and effective against Mezz and the Guarantors, Poole, Spa, Golf, Basin, Lodge, Treeline, Mountain Top and Lone Mountain.  Release 2 encompasses any claim or defense that Poole may have had under the Sponsor Carve Out Guaranty and is a release by Mezz of any claim or defense it may have had to the Environmental Indemnity Agreement. Release 2 is also a release by Pledgors Poole, Six Shooter and JVLP.  However, because the Pledge Agreement filed at Exhibit Q is not signed by Anderson or Aardvark, the Court finds that a question of facts exists as to whether Anderson and Aardvark's release, as set forth in Release 2, is valid and effective.  Once again, the Court has insufficient facts to determine whether Poole validly and effectively released his claims and defenses under the Environmental Indemnity Agreement to the Mezz Loan.

Release 3 is a valid and effective release of all claims as between LBI and MBRanch.

79

Release 5 is not effective as between any of the parties. Finally, Release 4 is valid and effective as to any and all claims of MBRanch. The Release is also valid and effective as to Basin, Golf, Lodge, Spa, Mountain Top, Treeline, Lone Mountain, Mountain Top, Frontier Stone, Poole, Six Shooter, JVLP, Anderson and Aardvark. Release 4 is also effective against any claim that Poole might assert under the Sponsor Carve Out Guaranty or the Pledge Agreement. The Court finds an issue of fact as to whether Poole released his claims under the Environmental Indemnity Agreement.

In accordance with the forgoing, the Court will enter a separate Order and Judgment providing as follows:

IT IS ORDERED and ADJUDGED that Plaintiffs' Motion for Summary Judgment on the Releases filed February 22, 2010, at docket entry no. 16, is GRANTED, in part and DENIED in part, as follows:

1. Release 1 set forth in the June 5, 2008, Senior Extension Agreement, Exhibit BB to the Plaintiffs' Complaint, is a valid and effective release of all claims by MBRanch (the Borrower), and the Guarantors, Poole, Spa, Golf, Basin, Lodge, Treeline, Mountain Top and Lone Mountain. Release 1 is a release by Poole of any claim or defense he may have asserted under the Sponsor Carve Out Guaranty and is a release by MBRanch of any claim or defense it may have had to the Environmental Indemnity Agreement. However, because the General Release in the Senior Extension Agreement does not mention Pledgors or Indemnitors and is not signed by any party as a Pledgor or Indemnitor, the Court finds at this time that Release 1 is not necessarily a release of claims and defenses by the Pledgors

under the Pledge Agreement.  Likewise, the Court cannot conclude at this time that Release 1 is a release by Poole of his claims and defenses under the Environmental Indemnity Agreement.

2.  Release 2 set forth in the June 5, 2008, Mezz Ratification and Amendment, Exhibit CC to the Plaintiffs' Complaint, is valid and effective against Mezz and the Guarantors, Poole, Spa, Golf, Basin, Lodge, Treeline, Mountain Top and Lone Mountain.  Release 2 encompasses any claim or defense that Poole may have had under the Sponsor Carve Out Guaranty and is a release by Mezz of any claim or defense it may have had to the Environmental Indemnity Agreement.  Release 2 is also a release by Pledgors Poole, Six Shooter and JVLP.  However, because the Pledge Agreement filed at Exhibit Q is not signed by Anderson or Aardvark, the Court finds that a question of facts exists as to whether Anderson and Aardvark's release, as set forth in Release 2, is valid and effective.  Once again, the Court has insufficient facts to determine whether Poole validly and effectively released his claims and defenses under the Environmental Indemnity Agreement to the Mezz Loan.

3.  Release 3 set forth in the June 5, 2008, Advisory Amendment, Exhibit AA to the Plaintiffs' Complaint, is valid and enforceable against MBRanch by LBI in any capacity and its respective members, partners, affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and its respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing.

4.    Release 4 set forth in the June 19, 2009, Senior Forbearance Agreement, Exhibit

GG to the Plaintiffs' Complaint, is valid and enforceable against MBRanch.  The

Release is also valid and effective as to Basin, Golf, Lodge, Spa, Mountain Top,

Treeline, Lone Mountain, Mountain Top, Frontier Stone, Poole, Six Shooter,

JVLP, Anderson and Aardvark.  Release 4 is also effective against any claim that

Poole might assert under the Sponsor Carve Out Guaranty or the Pledge

Agreement.  The Court finds an issue of fact as to whether Poole released his

claims under the Environmental Indemnity Agreement.

5.    The Plaintiffs have failed to show that the Release in the June 19, 2009, Mezz

Forbearance Agreement, Exhibit HH to the Plaintiffs' Complaint, is valid and

enforceable against any of the Defendants in this action.


BY THE COURT

_Ralph B Kirscher_
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana